579 F.2d 1358
 UNITED STATES of America, Plaintiff-Appellant,
v.
David L. CALZADA, Victor Crespolara, Gerald Dee Matthews,
Patrick Martin Whittaker, Richard Allen Whittaker, Eliseo
Balcazar-Rangel, Maria de Los Angeles Reyes-de Balcazar,
Joel Tellez-Romero and John Doe, also known as Luis(an adult
male of Spanish descent), Defendants-Appellees.
 No. 78-1043.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 2, 1978.
Decided July 12, 1978.
As Amended July 14, 1978.
 
 Joseph Hosteny, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellant.
 Nancy Schaefer, Chicago, Ill., for defendants-appellees.
 Before FAIRCHILD, Chief Judge, and CUMMINGS and SPRECHER, Circuit Judges.
 SPRECHER, Circuit Judge.
 
 
 1
 The issue in this appeal brought by the United States is whether a defendant's right to compulsory process under the Sixth Amendment of the United States Constitution is violated when the government deports material witnesses to the crime before the defendant has a reasonable opportunity to interview them.
 
 
 2
 * The eight defendants-appellees were charged in an indictment on June 30, 1977, with conspiracy to transport and conceal illegal aliens in violation of 18 U.S.C. § 371; transporting illegal aliens in violation of 8 U.S.C. § 1324(a) (2);[1] and concealing illegal aliens in violation of 8 U.S.C. § 1324(a)(3).[2] The government's case as alleged in its indictment[3] charged that the defendants, with the assistance of two undercover police officers, had picked up twenty illegal Mexican aliens in a desert in Arizona and taken them to Phoenix where they were concealed for a time until it was decided where they should be transported. Defendants eventually took the twenty illegal aliens to Joliet, Illinois, where they again were concealed until they were transported to Lockport, Illinois.
 
 
 3
 Thirteen of the twenty aliens were arrested[4] in Lockport on April 29, 1977. They were then taken to the Metropolitan Correctional Center in Chicago, Illinois, and interviewed by the government. On May 4, 1977, the government permitted two of the aliens who were juveniles to return to Mexico. On May 29, 1977, the government deported three more of the thirteen aliens, all of whom were adults. Some time later, the government released two more aliens who then departed from the United States.[5] In the indictment issued on June 30, the government named the remaining six aliens as persons transported and concealed by the defendants. Thus, prior to the filing of the indictment, the government had acted affirmatively to make three of the thirteen aliens unavailable to the defendants and had permitted another four to become unavailable to them.
 
 
 4
 Three of the defendants moved to dismiss their indictments when they learned that potential witnesses, I. e., the unavailable aliens, were no longer subject to compulsory process. The district court held that the government's action violated the defendants' rights to compulsory process, thereby depriving them of a fair trial. The court therefore granted the motion to dismiss the indictment as to the three defendants and invited the other five defendants to file similar motions. They did so, and the district court dismissed their indictments. The government filed a motion for reconsideration which the district court denied. The government appeals the dismissal of the indictment against all eight defendants.[6]
 
 II
 
 5
 The Supreme Court in Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), held that the right to compulsory process guaranteed by the Sixth Amendment is a fundamental element of due process of law, and as such it should be interpreted broadly. See generally Westen, The Compulsory Process Clause, 73 Mich.L.Rev. 71, 113-15 (1974). In so holding the Court recognized that
 
 
 6
 (t)he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms The right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.
 
 
 7
 388 U.S. at 19, 87 S.Ct. at 1923 (emphasis added).
 
 
 8
 The Ninth Circuit Court of Appeals, relying on Washington v. Texas, has concluded that the right to compulsory process for a defendant includes the
 
 
 9
 right to formulate his defense uninhibited by government conduct that, in effect, prevents him from interviewing witnesses who may be involved and from determining whether he will subpoena and call them in his defense.
 
 
 10
 United States v. Tsutagawa, 500 F.2d 420, 423 (9th Cir. 1974). See also United States v. Mendez-Rodriguez, 450 F.2d 1 (9th Cir. 1971). Thus, the Ninth Circuit has concluded that if the government deports illegal aliens knowing that they are potential witnesses for those defendants who allegedly transported them, then the government violates the defendants' rights to compulsory process. We agree with the Ninth Circuit because it seems to us beyond serious dispute that the essence of the right to compulsory process is lost when the government can act through its deportation powers to deprive a defendant of the testimony of an eyewitness to the crime for which he or she is charged.
 
 
 11
 Having reached this conclusion, however, we should make clear that dismissal of an indictment is not required in every case in which a potential alien witness somehow escapes the subpoena power of a federal court. For instance, the Ninth Circuit has recognized that the government, with court approval, may release a juvenile illegal alien from custody in the interest of "human values." United States v. Carrillo-Frausto, 500 F.2d 234, 235 (9th Cir. 1974).[7] Also, the Ninth Circuit has held that the federal government is not obligated to keep potential witnesses who are not charged with a crime in custody to guarantee that they do not leave the country. United States v. Verduzco-Macias, 463 F.2d 105, 106 (9th Cir.) Cert. denied, 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972).[8] Finally, the Ninth Circuit has held that the defendants must show that the unavailable aliens might have been actual witnesses to the crime for which the defendants have been charged. United States v. McQuillan, 507 F.2d 30, 33 (9th Cir. 1974). Obviously, in a case such as ours, where the illegal aliens are the subject of the crime, the McQuillan requirement is readily satisfied. None of these exceptions, however, alters the basic prohibition against the government from deporting aliens who are material witnesses. In addition, none of the exceptions applies to this case. Thus, unless we are to adopt some rule different from that presently employed in the Ninth Circuit we must conclude that the district court's dismissal of the indictment was appropriate.
 
 
 12
 The view that the government asks this court to adopt is that there is no substantial violation of the defendants' rights requiring dismissal of an indictment unless there is a showing of prosecutorial bad faith or undue prejudice to the defendant's case. We disagree.
 
 
 13
 With regard to prosecutorial bad faith, we are of the opinion that failure to prove willful misconduct is irrelevant to determining the appropriateness of the district court's dismissal of a defendant's indictment. The right to compulsory process is not so much a bar against governmental misconduct as it is a protection of the defendant's ability to present his or her case. Washington v. Texas, supra, 388 U.S. at 19, 87 S.Ct. 1920. As one commentator has noted:
 
 
 14
 Although earlier cases viewed dismissal as a penalty for official misconduct and imposed it only where the prosecutor lost or destroyed the evidence in "bad faith," the recent cases recognize that dismissal also protects the defendant's affirmative right to put on a defense. Accordingly, dismissal may be required even when the prosecutor has acted in good faith. . . .
 
 
 15
 Westen, Supra at 174-75. Thus, we conclude that the policy behind the Sixth Amendment right to compulsory process cannot be fully protected if we require that prosecutorial "bad faith" be shown before a federal district court can impose an effective constitutional remedy.[9] We therefore reject the government's argument on this issue.
 
 
 16
 A much more difficult question arises with regard to whether prejudice to the defendants' case must be shown prior to dismissal. Since the right to compulsory process is intended to protect a defendant's ability to present a defense, it would seem in the abstract to be not unreasonable to expect a showing of specific injury to that interest before a court should conclude that the right has been violated. Viewed in context, however, it is quite clear that such a requirement applied to this case would emasculate the defendants' rights to compulsory process. Since no defendant could ever be able to show with any degree of assuredness what a witness whom he has never interviewed might say on his behalf, a demonstration of prejudice will be impossible.
 
 
 17
 This problem has been recognized by the Ninth Circuit Court of Appeals in its Mendez-Rodriguez, supra, decision. There the court reasoned that
 
 
 18
 appellant was, by Government action, deprived of the opportunity to interview said witnesses. Appellant couldn't know what these witnesses might say, if anything. We are in the same position as the appellant. We decline to indulge in any speculation that the interviews would, or would not, have been fruitful to the defense.
 
 
 19
 450 F.2d at 5. We agree with that analysis and therefore conclude that the defendant need not show prejudice to his or her case arising from the government's violation of the right to compulsory process by deporting eyewitnesses to the crime at issue.
 
 
 20
 The government argues finally that this court previously has decided in United States v. Perlman, 430 F.2d 22 (7th Cir. 1970), that there must be a showing of prejudice or bad faith before a dismissal of an indictment is proper. In Perlman a co-conspirator in the sale of narcotics was deported prior to the defendant's trial. The defendant was tried and found guilty. On review of that conviction, the court declined to reverse since the defendant could show neither prejudice nor prosecutorial bad faith.
 
 
 21
 We find it somewhat unusual that the government should place so much reliance on Perlman given the court's statements in that opinion that the government's conduct in deporting material witnesses while not "in bad faith" nonetheless should not be sanctioned judicially. 430 F.2d at 25. Moreover, Perlman is basically distinguishable from this case. The court's analysis sought to determine whether the clear mistake on the government's part was nonetheless "harmless" to the defendant in light of the facts of that case. The court correctly concluded that since the defendant after a full trial could not even "point to" anything that his co-conspirator might say that could assist his defense, there was no basis for reversing the conviction.
 
 
 22
 We, however, are faced with a much different factual and procedural context for deciding this case. The government has not heeded the admonishment of the Perlman court that
 
 
 23
 it would seem reasonable to require sufficient coordination between the various governmental institutions to permit notification thereafter and at least an opportunity for a defendant to determine himself whether any benefit might be derived from the testimony of his codefendant. This would permit the various interests to be balanced and would avoid embarrassment to the Government in the future.
 
 
 24
 Id. at 26 n. 5. Thus, unlike prior to Perlman, the government was on notice that this court does not approve the practice of deporting material witnesses prior to giving a defendant an opportunity to interview them. It, however, failed to take adequate precautions to avoid this problem, and we therefore have little sympathy for the government's argument that dismissal of an indictment is a drastic sanction for this inadvertent mistake.
 
 
 25
 On the record before us, we cannot say that the district court erred in finding that the defendants' constitutional rights to compulsory process had been violated, nor that it abused its discretion in concluding that the only reasonable remedy for that violation was the dismissal of the indictment. The district court concluded that defendants could not receive a fair trial because of the government's conduct, and we find no basis upon which to disagree with that conclusion.[10]
 
 
 26
 For the reasons stated above, therefore, we affirm the judgment of the district court dismissing the indictment against all eight defendants.
 
 
 27
 AFFIRMED.
 
 
 28
 CUMMINGS, Circuit Judge, dissenting.
 
 
 29
 This indictment charges defendants with transporting and concealing six illegal aliens and conspiring to do so, in violation of 8 U.S.C. §§ 1324(a)(2) and 1324(a)(3) and 18 U.S.C. § 371. All six aliens were made available to defendants' counsel when their depositions were taken by the Government on September 3, 1977, after defendants' objections to the depositions had been overruled. The record indicates that Chicago defense counsel's earliest interest in interviewing any of the other seven transported aliens occurred at the July 14, 1977, pretrial conference after they had returned to Mexico (R. Item No. 11). Counsel did not complain of their removal until July 28 (Pamphlet R. Item No. 10 at pp. 10-12).
 
 
 30
 There was ample opportunity for Arizona or Illinois defense counsel to interview five of the seven arrested aliens between the time of the aliens' April 29 arrest and their return to Mexico. Consequently, United States v. Tsutagawa, 500 F.2d 420 (9th Cir. 1974), and United States v. Mendez-Rodriguez, 450 F.2d 1 (9th Cir. 1971), relied upon in the majority opinion, are inapplicable. There is no showing that the remaining two[1] had any exculpatory information. The Government made every effort to insure juvenile Figueroa-Ramirez's availability for a deposition, but defense counsel procrastinated until he returned to Mexico on August 13. The prosecutor also offered to stipulate to the various absent aliens' inability to identify the defendants.
 
 
 31
 The twelve arrest statements[2] and six depositions are alike in vital respects, so that it is specious for defense counsel to assert that the seven aliens who are back in Mexico possess exculpatory information. One can speculate from this record that present defense counsel dragged their feet until some of the witnesses were again in Mexico in order to use their absence as a ground for dismissal of the indictment.[3] Indeed only counsel for three defendants (Matthews, Calzada and Tellez-Romero) originally sought dismissal for that reason, and only counsel for those same three appeared actively in this Court in opposition to the Government's appeal. The other five defendants received a windfall in securing dismissal as to them in January 1978 and have not even seen fit to champion their free ride.
 
 
 32
 Instead of showing prosecutorial bad faith, the record shows that no indicted defendant sought to interview any of the arrested aliens before August 7, 1977,[4] three months after their arrests and long after defendants' own arrests.[5] In light of the fortuitous freedom from prosecution that they obtain by the kind of relief afforded here, it is not too much to require that defendants act diligently to preserve their rights before they can profit from the Government's inadvertent error, the costs of which could have been largely avoided by diligent action by the defendants. When confronted with similar problems such as the failure to grant a speedy trial, courts at least consider whether defense counsel made demands or took appropriate steps to raise the problem when it still could be corrected. See Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101; cf. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342. Here defendants' Arizona counsel could have preserved the testimony of the aliens deported on May 29 and neither the Government nor the defendants even attempt to offer any serious explanation for the defendants' inaction as to the remaining witnesses.
 
 
 33
 As in United States v. Perlman, 430 F.2d 22, 25 (7th Cir. 1970), certiorari denied, 400 U.S. 832, 91 S.Ct. 64, 27 L.Ed.2d 63, there was no attempt by the Government to exclude from consideration any testimony of the seven aliens now in Mexico. All but Figueroa-Ramirez and Lopez-Pantoja had returned to Mexico before defense counsel requested their production. Nothing in the record shows that the Government shipped the other five out to avoid their being interviewed by defense counsel. Indeed the prosecutor strove to halt the May 29th deportation of the three adult aliens. As noted, defense counsel did interview Figueroa-Ramirez on August 7 and the Government ultimately cooperated in trying to make him available for a deposition before his August 13 return to Mexico. On August 3, the Government advised defense counsel that Lopez-Pantoja's whereabouts was unknown. The record shows no defense effort to locate him before his post-September 29 return to Mexico.[6] (Defendants' Br. 11, 17-18.)
 
 
 34
 The majority opinion is built around the May 29th departure of three aliens, whose testimony certainly could have been preserved by diligent Arizona defense counsel. While allowing departure should not be applauded, in the absence of prosecutorial misconduct or the slightest showing that the three departed witnesses might have been helpful, Perlman establishes that their unintended departure is not a ground for dismissal. The majority attempts to distinguish Perlman on the ground that as a result of our opinion in that case the Government here was on notice that no witnesses should be deported; yet at the same time the majority disclaims any reliance on Government bad faith and in effect establishes a rule that in the absence of bad faith the Government's state of mind is irrelevant. If after our warning in Perlman a number of cases with inadvertent departures of witnesses had occurred, there might be some cause for the majority's decision to ignore Perlman and substitute a Per se rule. But no claim is made that cases like this one are not rare exceptions, and therefore no persuasive reason to depart from Perlman has been offered. In fact, the wisdom of Perlman's requirement of a showing of a possibility of prejudice has been confirmed by the use of a similar requirement in cases involving informants who erroneously were not made available as witnesses. United States v. Long, 533 F.2d 505, 508 (9th Cir. 1976); see Greenwell v. United States, 115 U.S.App.D.C. 44, 317 F.2d 108 (1963); United States v. Miranda, 526 F.2d 1319, 1328 (2d Cir. 1975), certiorari denied, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82.
 
 
 35
 Applying Perlman to the facts of this case, it is important to note first that under the majority's rationale only three of 13 witnesses to the same crimes were mistakenly deported by the Government. Also significant is the fact that the prosecutor offered to stipulate to the absent aliens' inability to identify the defendants. Most telling is the fact that only defendant Calzada even attempted to explain how an absent witness, already interviewed by his counsel, might aid his cause beyond the aid offered by the available witnesses and by the proposed stipulation. Even he does not explain why he needs testimony from the three May 29 deportees. While it may be true that few defendants could ever "show with any degree of assuredness" (p. 1362, Supra ) what a potential witness might say on their behalf, it does not seem too much to require that they offer at least a plausible theory, perhaps with some degree of consistency with testimony from other witnesses when, as here, they are available, of how any added witness might be more helpful than a prosecutor's offered stipulation of non-identification.
 
 
 36
 As in Perlman, there is thus a complete absence of prosecutorial misconduct and no showing that the absent aliens' testimony would exculpate defendants or differ from those named in the indictment. Defendants' ability to present their case remains unimpaired. Therefore, the relief granted below was an abuse of discretion. The accepted teachings of Perlman require a reversal of the dismissal of the orders dismissing the indictment.
 
 
 
 [1]
 That section makes it a crime for
 (a)ny person . . . who . . . (2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports . . . within the United States . . . any alien . . . .
 8 U.S.C. § 1324(a)(2).
 
 
 [2]
 That section makes it a crime for
 (a)ny person, . . . who . . . (3) willfully or knowingly conceals, harbors, or shields from detection, . . . in any place, including any building or any means of transportation . . . any alien . . . .
 8 U.S.C. § 1324(a)(3).
 
 
 [3]
 In a case such as this where the district court dismissed the indictment, we must accept as true the facts alleged in that indictment. See United States v. South Florida Asphalt Co., 329 F.2d 860 (5th Cir.), Cert. denied, 379 U.S. 880, 85 S.Ct. 149, 13 L.Ed.2d 87 (1964)
 
 
 [4]
 Apparently seven of the illegal aliens escaped either before or during the arrest in Lockport, Illinois
 
 
 [5]
 The parties engaged in a substantial dispute over the defendants' conduct in relation to one of the aliens who was believed to have left the country but who was subsequently located. Apparently the government believes that the defendants' handling of this witness demonstrates how little concern the defendants had for interviewing these witnesses. Our review of the record, however, discloses that the defendants made a good faith effort to both interview that witness and to guarantee his presence for the trial. We find no fault on either side arising from the fact that that witness escaped the country. That witness is not the basis for our holding that the indictment should be dismissed
 
 
 [6]
 Three of the defendants, Matthews, Calzada and Tellez-Romero, argue that the government failed to preserve its right to appeal as to them. We agree with the government that it reasonably relied on the district court's remarks at the time the court dismissed the indictment as to these defendants in delaying the filing of a notice of appeal. See Thompson v. I.N.S., 375 U.S. 384, 84 S.Ct. 397, 11 L.Ed.2d 404 (1964); Martinez v. Trainor, 556 F.2d 818, 820 (7th Cir. 1977). In this situation, we do not believe that the government has lost its right to appeal
 
 
 [7]
 Although the district court, in part, relied upon the release of the two juvenile alien witnesses in dismissing the indictment, we decline to decide whether their release alone would have sufficed to justify the court's action. We do note that unlike the situation in Carrillo-Frausto, supra, the aliens were sent back to Mexico by the government and not by a magistrate. Whether that fact is significant, we need not decide
 
 
 [8]
 The record does not make clear the circumstances surrounding the release of the last two prospective alien witnesses. We do not know whether they were merely released from custody as was the case in Verduzco-Macias, supra, or whether they were deported. We, however, need not rely upon their release as the basis for our decision since we know that the government did deport three of the aliens before the defendants had reasonable opportunity to interview them. See note 10 Infra
 
 
 [9]
 We do not mean to imply that the question of "bad faith" is not a factor in a decision whether to dismiss an indictment. Certainly if a district court should conclude that the government has acted in "bad faith" in withholding evidence or concealing it, then dismissal might be the only appropriate action. All that we are deciding is that a finding of "bad faith" or prosecutorial misconduct is not a precondition to dismissing an indictment if the government deports a material witness
 
 
 [10]
 Much space in the briefs for both parties is spent arguing about whether the defendants acted with sufficient dispatch after their arrests to protect their interest in retaining the illegal aliens as witnesses. Basically, the government argues that defendants had plenty of time to interview all of the witnesses before they were deported
 This question, however, was raised before the district court and it held that the "(d)efendants' failure to request the Government to retain custody is understandable" (Memorandum Opinion, Nov. 16, 1977 at 9). The court reached this conclusion on the basis of the short time between defendants' arrests and the deportation of the two juvenile witnesses and the three adult witnesses.
 We need not rely on the release of the juvenile aliens as the basis for our decision because it is clear that defendants were not given a reasonable opportunity to interview the three adult aliens who were deported without notice to the defendants less than a month after the arrests, and several weeks prior to the issuance of the indictment in the federal district court. With regard to those witnesses, there is nothing in the record that suggests that the defendants declined to protect their rights. We therefore agree with the district court's conclusion that defendants through no fault of their own were deprived of a reasonable opportunity to interview the three material witnesses.
 
 
 [1]
 Two minors were unavailable because at their request they were permitted to return to Mexico on May 4 for humanitarian reasons. See United States v. Carrillo-Frausto, 500 F.2d 234 (9th Cir. 1974), where the court approved a magistrate's release of Mexican minors, prospective witnesses, for return to Mexico for such reasons
 
 
 [2]
 Lopez-Villanueva did not make an arrest statement but was deposed on September 3
 
 
 [3]
 Only defendant Whittaker's Arizona attorney had requested the federal magistrate in Arizona to retain the aliens in the United States. Whittaker was arrested on May 4. This request was made on May 13, 1977, when the case was removed to the Northern District of Illinois. The aliens were no longer in the District of Arizona. No such request was made in the Northern District of Illinois
 
 
 [4]
 The August 7 interview between defendant Calzada's counsel and Figueroa-Ramirez does not dispose of the Government's case against Calzada. See U.S. Reply Br. 25-26 and Appendix C to Calzada's Br. Two of the six deponents disagreed with Figueroa-Ramirez's version of the event. Calzada does not indicate why he cannot make his defense without the three aliens who left this country on May 29
 
 
 [5]
 Two defendants were arrested in late April 1977, five in early May and the eighth in early July
 
 
 [6]
 The majority opinion incorrectly states that the Government permitted Figueroa-Ramirez and Lopez-Pantoja to leave the country prior to the June 30 indictment. It also incorrectly states that the seven unavailable aliens are the subject of the crime. The substantive counts of the indictment make only the six available aliens the subject of the crime, and the conspiracy count makes them the principal subject of that offense