**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Maximo AVILA–DOMINGUEZ, Albert Perez, Evangeline Salazar and Carolyn Sanchez, Defendants-Appellants.**

No. 78–5575.

United States Court of Appeals,
Fifth Circuit.

Feb. 1, 1980.

Rehearing and Rehearing En Banc
Denied Feb. 28, 1980.

Herbert E. Cooper, Asst. Federal Public Defender, El Paso, Tex., for Avila-Dominguez.

Anthony C. Aguilar, El Paso, Tex., for Perez, Salazar & Sanchez.

LeRoy M. Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, AINSWORTH and RONEY, Circuit Judges.

RONEY, Circuit Judge:

This case involves multiple convictions for assisting Mexican aliens in illegally entering the United States. The most serious question is whether the convictions should be reversed because the Government deported potential witnesses before defendants' counsel could interview them. Acknowledging that the Government violated defendants' constitutional rights, we nevertheless affirm the convictions, partly because the case has an element of waiver of those rights, but more importantly because no suggestion has been made to this Court or the district court as to how the witnesses might have, in the slightest way, helped defendants in the defense of this case.

The facts on this controlling issue are undisputed. Acting on an informant's tip and surveillance, an Immigration and Naturalization Service (INS) agent stopped a pickup truck driven by defendant Perez and placed him under arrest. Perez opened the

truck's camper shell at the agent's request, and twenty-two illegal aliens were discovered within. In the meantime, another INS agent arrested defendants Avila, Salazar and Sanchez in the nearby parking lot from which the truck had departed.

The twenty-two illegal aliens were taken into the custody of the INS and each was interviewed by an INS agent. The United States Attorney determined that eight of them would be detained as material witnesses, and a written statement was taken from each of those eight. The sole woman alien in custody and the two children accompanying her were granted voluntary return to Mexico on the day of defendants' arrests because of the inadequacy of detention facilities. Deportation proceedings were begun against the other eleven aliens and they were deported to Mexico ten days later. The dates are significant. The arrests occurred on April 22, 1978. Initial appearances were made and bonds were set on April 24. Defendants then had an attorney. The eleven aliens in question were deported on May 2.

At the preliminary hearing on May 3, an INS agent unintentionally misinformed defendants' counsel that nineteen aliens remained in custody, including the eleven who had actually been deported the previous day. On June 16, defendants moved for dismissal because of the Government's failure to provide the names of the deported aliens and make them available for interviews. The district court denied the motion to dismiss, but ordered the Government to furnish the names and addresses of the witnesses. The aliens resided in Mexico, however, and were not available to be interviewed or deposed by defendants' counsel.

Defendants Avila, Perez, Salazar and Sanchez were convicted of conspiracy, 18 U.S.C.A. § 371, to encourage or induce the entry of illegal aliens into the United States in violation of 8 U.S.C.A. § 1324(a)(4), and to transport those aliens within the United States in violation of 8 U.S.C.A. § 1324(a)(2). Avila was also convicted on six counts for violating 8 U.S.C.A. § 1324(a)(4), and Perez was convicted on eight counts for violating 8 U.S.C.A. § 1324(a)(2).

### Deportation of Witnesses

Relying on *United States v. Mendez-Rodriguez*, 450 F.2d 1 (9th Cir. 1971), defendants argue the Government violated their Fifth Amendment right to due process and their Sixth Amendment right to compulsory process by deporting the potential witnesses before defendants were notified of their impending deportation and given an opportunity to interview them. In *Mendez-Rodriguez*, defendant was charged with violations of 18 U.S.C.A. § 371 and 8 U.S.C.A. § 1324(a)(2) and convicted on the basis of testimony of three aliens who had been detained in the United States pending his trial. In reversing the convictions, the Ninth Circuit held that defendant's Fifth and Sixth Amendment rights were violated by the deportation to Mexico of three *other* alien witnesses before defendant had an opportunity to interview them. The court held the defendant was not required to show prejudice resulting from the unavailability of the deported witnesses. *See also United States v. Tsutagawa*, 500 F.2d 420 (9th Cir. 1974).

The Seventh Circuit adopted the rule of *Mendez-Rodriguez* in *United States v. Calzada*, 579 F.2d 1358, *cert. dismissed*, 439 U.S. 920 (1978). That decision affirmed the district court's dismissal of indictments against eight defendants because seven of thirteen potential alien witnesses had been made unavailable by the Government for interviewing by defendants. The court based its decision solely on the right to compulsory process, and rejected the Government's argument that defendants would be entitled to relief only on a showing of either prosecutorial bad faith or prejudice to defendants.

The effect of Government conduct such as this has not heretofore been addressed by our Court. The opinion in *Uribe v. United States*, 529 F.2d 742 (5th Cir. 1976), specifically reserved the issue for later determination:

Because of our resolution of this question, we need not decide whether we agree with the Ninth Circuit that due process is denied when the Government deports potential witnesses before the defendant has an opportunity to interview them. *United States v. Mendez-Rodriguez*, 9 Cir. 1971, 450 F.2d 1.

529 F.2d at 743 n. 3.

■ We agree with the Ninth and Seventh Circuits that a criminal defendant's constitutional rights are violated if an alien witness is deported before the defendant is given an opportunity to interview the witness. The reasoning of those cases appears sound and we adopt it as our own, without repetition here. We disagree, however, with the automatic reversals and indictment dismissals which occurred in those cases.

We base the affirmance of these convictions on two rationales. First, defendants' interest in the deported aliens heightened once they were unavailable, and the case is flavored with an element of waiver, even though defendants' conduct is not clothed with a full-dress waiver of a constitutional right. *Cf. United States v. Lujan-Castro*, 602 F.2d 877 (9th Cir. 1979) (defendant knowingly waived right to have alien witnesses retained in the United States).

Defendants were arrested and the illegal aliens taken into custody on April 22, 1978. Complaints issued against defendants on April 24, notifying them of the crimes with which they were charged. That same day defendants were represented by counsel at initial appearances before the court. More than a week after the initial appearances, on the tenth day after defendants' arrests, the eleven aliens were ordered deported to Mexico by a special inquiry officer of the INS.

Although defense counsel asserted that he had inquired about the names and location of the aliens on or about April 24, the district judge noted that defense counsel failed to show that he had made any efforts to follow up that informal inquiry.

A requirement that defendants act diligently to preserve the testimony of illegal aliens must be imposed in the circumstances of these cases. Otherwise, the great burden and expense of detaining and housing alien witnesses is borne by the Government, while defendants delay the simple efforts involved in locating and interviewing them. Although detention methods involving parole or work programs rather than incarceration would be less burdensome to the Government, these entail the risk of escape by the alien, defeating the purposes of both detention for trial and deportation. *See United States v. Verduzco-Macias*, 463 F.2d 105 (9th Cir.), *cert. denied*, 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972).

Defendants could have preserved the testimony of the eleven deported aliens by making a prompt formal request for their names and whereabouts. If there had been insufficient time to interview all the witnesses, a postponement of their deportation could have been sought. Any alien believed by defendants to be able to give exculpatory testimony could have been detained in this country until trial.

■ Since we believe, however, that the better procedure for protecting the constitutional rights here involved would be for the Government to give notice of prospective deportation and a reasonable opportunity for defense counsel to interview the witnesses, we are not comfortable with resting an affirmance on the ground of waiver alone.

The second and more compelling rationale for this decision is that not the slightest suggestion has been made as to what testimony helpful to defendants these witnesses could offer. We are in general accord with the proposition set forth in *Mendez-Rodriguez* and *Calzada* that to obtain relief in a case of this kind, the defendant need not show prejudice arising from the violation with "any degree of assuredness." 579 F.2d at 1362. But we agree with the dissents in both of those cases that reversal is not warranted where the "record is completely devoid of anything which would suggest that the testimony of any one, or more, of the deported persons would have been help-

ful" to the defendants, 450 F.2d at 6, and that "it does not seem too much to require that they offer at least a plausible theory" of how the testimony of the witnesses would be helpful to the defense. 579 F.2d at 1365. The purpose of a criminal trial is to produce evidence which shows the truth. The purpose of criminal procedure is to assure that end through fair means. It is important to remember that the defendants presumably know the truth in this case. It does not damage the underlying purposes of the Fifth Amendment to require that at least in counsel's brief or argument, some suggestion be made as to how the deported witnesses might advance the cause of revealing the truth.

Nothing in the record permits an inference that defendants were prejudiced by the unavailability of the alien witnesses. An INS agent testified that each of the aliens related basically the same story, and that the decision as to deportation turned on the superior health and fitness of the aliens chosen for detention. Proof of conspiracy focused on transactions between various defendants and the aliens who testified at trial, not those who were deported. Prosecution of the substantive counts was based on the illegal entry and transportation of the aliens who testified at trial, not those who were deported.

Thus, while adhering to the principles set forth in the Ninth and Seventh Circuit cases, we refuse to blindly apply those principles where there is no suggested suspicion that the deported witnesses could give testimony which would affect the trial in any way at all. We need not here decide with what strength any such theory of helpfulness would need to be advanced by counsel to justify relief. All we do is hold that where there is nothing, reversal is not required.

We especially note that the Government neither acted in bad faith nor purposefully deprived defendants of their rights. Now that the Government knows we subscribe to the rule that defendants have a constitutional right to interview such witnesses, and must be given reasonable notice before their deportation, this decision will not necessarily immunize subsequent similar conduct. Likewise, our comments here about the need for counsel to act promptly should suggest that purposeful delay which imposes on the Government the hardship of retaining witnesses not needed in good faith by the defense will be of little avail.

## Duplicity

■ Defendants sought dismissal of Count One of the indictment for duplicity because it alleged conspiracy to commit two distinct substantive offenses, the inducement of illegal alien entry and the transport of illegal aliens. "The fact that the alleged conspiracy includes the violation of more than one federal statute does not make [the indictment] duplicitous." *Overstreet v. United States*, 321 F.2d 459, 461 (5th Cir. 1963), *cert. denied*, 376 U.S. 919, 84 S.Ct. 675, 11 L.Ed.2d 614 (1964).

■ The failure of the guilty verdict to specify which substantive crime was determined to be the object of the conspiracy is not prejudicial. Once a defendant is found guilty of participating in a conspiracy, it is "unnecessary that the verdict specify the particular statutory provision which an individual defendant conspired to violate." *United States v. Bolts*, 558 F.2d 316, 325–326 (5th Cir.), *cert. denied*, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977).

## Search and Seizure

The district court refused to suppress three types of evidence: Salazar's statements at the time of her arrest, the testimony of the detained alien witnesses, and certain sums of money taken from the defendants upon arrest. Defendants argue this evidence was obtained as the result of illegal arrests and should have been suppressed. *United States v. Cruz*, 581 F.2d 535, 538 (5th Cir. 1978) (*en banc*). *See United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

■ The Constitution does not require that a warrant issue prior to an arrest based on probable cause, even if no exigent

circumstances prevented the obtainment of a warrant. *United States v. Watson,* 423 U.S. 411, 423–424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). The test is whether the INS agents had probable cause at the time the arrests occurred:

Probable cause exists when the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed.

*United States v. Lowery,* 436 F.2d 1171, 1174 (5th Cir. 1970), *cert. denied,* 401 U.S. 978, 91 S.Ct. 1208, 28 L.Ed.2d 329 (1971), *citing Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

■ The INS agents clearly had probable cause to arrest defendants. An agent testified he had dealt with the informant on twenty prior occasions and was convinced of his reliability. Moreover, the informant's detailed information about the aliens' whereabouts, Salazar's appearance, and the presence of a woman alien accompanied by two children was corroborated by the agents' personal observations soon after surveillance began. *See United States v. Tuley,* 546 F.2d 1264 (5th Cir.), *cert. denied,* 424 U.S. 837, 98 S.Ct. 128, 54 L.Ed.2d 99 (1977). Finally, an agent observed through a window that more people were concealed in the camper than he had seen enter. This served to corroborate the informant's allegation of criminal conduct, especially in view of the lengthy time the truck remained in the parking lot. *See United States v. Smith,* 598 F.2d 936, 939–940 (5th Cir. 1979).

■ The searches of defendants incident to their lawful arrests were clearly proper, *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), even though the searches took place at the courthouse rather than at the sites of the arrests. *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *United States v. Castro,* 596 F.2d 674, 677 (5th Cir.), *cert. denied,* —— U.S. ——, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979).

The agent had probable cause for the search of the camper shell, so the testimony of the illegal aliens discovered therein was properly admissible. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *United States v. Wright,* 588 F.2d 189, 193 (5th Cir. 1979). Moreover, there was reason for concern that the aliens might flee if not taken promptly into custody. The district court did not err in admitting the evidence resulting from defendants' arrests and the accompanying searches.

### Sufficiency of the Evidence

■ Defendants challenge the sufficiency of the evidence to support the convictions. The essential elements of criminal conspiracy are an agreement between two or more persons to commit a crime and an overt act in furtherance of the agreement by one of the conspirators. *United States v. White,* 569 F.2d 263, 266 (5th Cir. 1978), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1979). Once the existence of the conspiracy is established, there must be substantial evidence that each alleged conspirator knew of, intended to join and participated in the conspiracy. *United States v. Malatesta,* 590 F.2d 1379 (5th Cir.) (*en banc*), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).

■ The evidence is viewed in the light most favorable to the Government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). In this case the evidence establishing the essential elements of conspiracy and defendants' knowledge, intent and participation therein is sufficient. Several weeks before their arrests, Salazar, Sanchez and Perez entered Mexico and recruited the aliens in Juarez, arranging to transport them to Chicago or Denver. Perez later returned to Mexico, and on the morning of April 22, 1978, he supervised the transportation of the aliens by municipal bus from downtown Juarez to an abandoned house near the border.

Avila and several unknown persons escorted the aliens to the border, where Avila

crossed first, ascertained that no INS patrols were present, and signalled the aliens to follow. He then walked the aliens to a pickup point, from which they were driven into El Paso. Sanchez and Avila collected fees from the aliens for the conspirators' assistance in bringing them into the United States. Additional payments were to be made after the aliens secured employment in Chicago and Denver.

As thus described by the testimony of the eight alien witnesses, the activities engaged in by defendants were not "random" or "separate," but rather evinced "continuous planning and cooperation [among] the persons involved." *United States v. Michel*, 588 F.2d 986, 995 (5th Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979)..

■ Avila also challenges the sufficiency of the evidence by which he was convicted on six counts of encouraging and inducing the aliens' entry into the United States, in violation of 8 U.S.C.A. § 1324(a)(4). The testimony of the alien witnesses fairly established that Avila met them across the border, assisted their transportation to the river, told them he would signal from the other side when it was safe to cross, scouted the vicinity for law enforcement officers, then called, whistled and waved to the aliens to indicate the right time for crossing. The surreptitious manner in which Avila led the aliens across the border and his subsequent acceptance of cash payments in exchange for that guidance amply support an inference of his knowledge that they were not lawfully entitled to enter the United States, and of the willfulness of his activity. *See United States v. Boerner*, 508 F.2d 1064, 1068 (5th Cir.), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975). From this evidence, a jury could reasonably conclude that Avila encouraged or induced the entry of illegal aliens into the United States.

■ Perez met the aliens in Mexico, coordinated their illegal entry into the United States, and was apprehended in El Paso while driving a truck in which they were passengers. The evidence is sufficient to establish his violations of 8 U.S.C.A. § 1324(a)(2), the transportation of illegal aliens within the United States.

AFFIRMED.