UNITED STATES of America,
Plaintiff-Appellee,

v.

Imer ARREDONDO–MORALES and Elva
Marin-Alarcon, Defendants-Appellants.

No. 79–5317.

United States Court of Appeals,
Fifth Circuit.

Aug. 21, 1980.

Russell M. Aboud, El Paso, Tex. (Court-appointed), for Arredondo-Morales.

Daniel Anchondo, El Paso, Tex. (Court-appointed), for Marin-Alarcon.

LeRoy Morgan Jahn, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, ANDERSON and THOMAS A. CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

Elva Marin-Alarcon was convicted of encouraging and inducing the entry of two undocumented aliens into the United States and transporting the two aliens within the United States in violation of 8 U.S.C. § 1324(a)(2) and 8 U.S.C. § 1324(a)(4). Marin was also convicted along with Imer Arredondo-Morales and 23 others of conspiring to encourage and induce the entry of undocumented aliens into the United States and to transport the aliens within the United States and to shield them from detection and arrest in violation of 8 U.S.C. § 1324(a)(3) and 18 U.S.C. § 371. Appellant Arredondo contends that the district court erred in denying her motion for acquittal after the guilty verdict because the evidence was insufficient to sustain the conviction. Appellant Marin claims that her constitutional rights were violated by the deportation of several alien witnesses prior to the trial and that the use of an electronic "beeper" tracking device without a warrant constituted an illegal search and resulted in an illegal arrest. We affirm.

Over a period from December 15, 1975 to January 26, 1979, several individuals were engaged in an operation designed to transfer undocumented aliens from Juarez, Mexico, into New Mexico and Colorado. Aliens desiring passage to the United States gathered in Juarez to await the next crossing. When a sufficient number of aliens had accumulated, they would be told to meet at Marin's house either early in the morning or late in the evening for the purpose of crossing the river. Upon paying Marin $50.00, she would take the aliens from her house to the banks of the Rio Grande River. Marin would also often lead the aliens across the river and into El Paso at the Franklin headgates.

The coconspirators were usually waiting in cars on the Texas side of the river. These cars were ferried across the river and legally admitted into the United States at established ports of entry by drivers who were paid for delivering the cars. To assure a greater degree of safety, two cars were involved in each transport. The first car served as a scout car to check for the presence of Immigration and Naturalization Service (INS) agents. The second car was used to transport the aliens. The drivers would take the aliens to a site in Denver or Albuquerque. They were then transported to other cities in Colorado and New Mexico.

With respect to Marin, the evidence revealed that on December 26, 1978, two undocumented aliens met with Marin in Juarez and arranged to be taken to Denver for a fee of $330 each. The aliens met at Marin's house in the early morning on December 27, 1978. She then led the two

aliens, accompanied by 12 other undocumented aliens, across the river and into Texas. Unknown to Marin, this activity was being observed by INS agents. The aliens walked to an apartment complex located one-quarter mile from the border. Ten minutes later, a Plymouth sedan and Ford station wagon appeared at the apartment complex. The Plymouth acted as the scout car and the station wagon carried Marin and the undocumented aliens. The INS agents followed the two cars at a distance.

Approximately two hours after the cars had left El Paso, an electronic tracking device carried on the person of a confidential informant posing as an undocumented alien was activated. The signal from the tracking device was intercepted by a pilot and airplane. The INS agents never acquired a warrant to use the tracking device. The station wagon was followed into Denver with the aid of the pilot. The INS agents from El Paso were then joined by Denver INS agents. A search warrant was secured and Marin and the other aliens were arrested.

Marin was advised of her rights twice. She then explained the operation to the INS agents, stating that she was responsible for making arrangements to transport the aliens to Denver for a fee of $330 per person. She also admitted that she had guided the aliens across the Rio Grande River.

Marin and Arredondo were indicted along with 23 others on February 15, 1979, in the United States District Court for the Western District of Texas, charging them with conspiring to encourage and induce the entry of undocumented aliens into the United States, guiding those aliens across the border, transporting the aliens within the United States, and shielding the aliens from detection and arrest. Marin was also charged with encouraging and inducing the entry of two aliens not entitled to admission in the United States and with transporting the aliens within the United States.

Marin was arraigned on March 21, 1979 where she pleaded not guilty and the trial was set for May 1, 1979. The district court severed the conspiracy count from the substantive counts. Marin was tried first on the substantive counts and she was convicted. She was then jointly tried with Arredondo and several coconspirators on the conspiracy charge. Both Marin and Arredondo were found guilty of conspiracy. Arredondo received a four-year sentence. Marin was sentenced to a five years for each of the four substantive counts, with the sentences to run concurrently, and five years for the conspiracy count to run consecutively with the substantive counts.

I. Sufficiency of Evidence.

 Arredondo contends that the district court erred in failing to grant her motion for acquittal because the evidence was insufficient to sustain her conviction for conspiracy. This question is governed by our decision in *United States v. Malatesta*, 590 F.2d 1379 (5th Cir.) (*en banc*), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). In order to convict a defendant of conspiracy, the existence of a conspiracy must be established with substantial evidence showing the presence of an agreement between two or more persons to commit a crime and an overt act in furtherance of the agreement by one of the conspirators. *United States v. White*, 569 F.2d 263 (5th Cir. 1978), *cert. denied*, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1979), and with substantial evidence showing that each conspirator knew of, intended to join and participated in the conspiracy. *United States v. Malatesta, supra.* Arredondo admits that the first requirement is satisfied. Therefore, the only question on appeal is whether Arredondo knew of, intended to join, and participated in the conspiracy.

 Because knowledge, intent, and participation are the necessary elements of the crime of conspiracy, the government must prove each of these elements beyond a reasonable doubt. *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *United States v. Salinas-Salinas*, 555 F.2d 470 (5th Cir. 1977). When reviewing the sufficiency of the evidence, the test

is whether a reasonably minded jury could conclude that the evidence is inconsistent with every reasonable hypothesis of the defendant's innocence. *United States v. Henderson*, 588 F.2d 157 (5th Cir. 1979); *United States v. Caro*, 569 F.2d 411 (5th Cir. 1978); *United States v. Warner*, 441 F.2d 821 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). The verdict will only be overturned if this court finds that the jury must necessarily have had a reasonable doubt. In making this assessment, the evidence must be viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and we must accept all reasonable inferences and credibility choices that tend to support the verdict. *United States v. Black*, 497 F.2d 1039 (5th Cir. 1974). The test is the same whether the evidence is direct or circumstantial. *Glasser v. United States, supra; United States v. Warner*, 441 F.2d 821 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). In a conspiracy case, the verdict of the jury must be sustained if there is substantial evidence to support it taking the view most favorable to the government. *United States v. Malatesta, supra*, 590 F.2d at 1382.

In light of these standards, we find that the government presented sufficient evidence to support the conviction of Arredondo for conspiracy to encourage and induce the entry of aliens into the United States and to transport the aliens across the border and to shield them from protection. Arredondo is charged with participation in the conspiracy. As such, the evidence reveals that on at least two occasions, Arredondo was seen by Pedro Valle-Borrelli at the headgates in El Paso. Valle was one of the individuals who would legally drive the automobiles into the United States at a port of entry. Without speaking to Arredondo, Valle would then hand the car over to appellant on the banks of the Rio Grande River. Valle did not give Arredondo any instructions on what she was to do with the car. Valle then would observe undocumented aliens crossing the river and getting into the car. All of this activity occurred at night or early in the morning. Arredondo would then drive away.

■ The evidence is sufficient under the proper standard to establish Arredondo's nexus to the conspiracy and his knowing participation therein. *United States v. Rodarte*, 596 F.2d 141 (5th Cir. 1979); *United States v. Teal*, 582 F.2d 343 (5th Cir. 1978); *United States v. Trevino*, 556 F.2d 1265 (5th Cir. 1977). Because guilty knowledge is difficult to prove by direct evidence, surrounding circumstances may supply inferences of knowledge which adequately prove intent. *United States v. Sink*, 586 F.2d 1041 (5th Cir. 1978), *cert. denied*, 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979). In this case, the evidence revealed a suspicious situation with aliens crossing the river, at an area known to be used by undocumented aliens, late at night or early in the morning and getting into a car driven by Arredondo. The car was given to Arredondo on the banks of the Rio Grande River and there was no conversation between the custodian of the car and appellant. Even though Arredondo received no instructions from the custodian of the car, she knew exactly what to do. She apparently had already been given her instructions by a coconspirator. The surrounding circumstances allow us to infer that Arredondo possessed sufficient knowledge and intent.

## II. Use of Transponder.

■ Marin complains that use of an electronic "beeper" tracking device concealed on the person of an informer, without a warrant, constituted an illegal search. This situation is governed by our decision in *United States v. Conroy*, 589 F.2d 1258 (5th Cir. 1979), a case which appellant is unable to distinguish. In *Conroy*, we held that an informant's installation of a beeper on a vessel used to transport marijuana did not constitute an invalid warrantless search because the informant was under no legal obligation to conceal his whereabouts and thus transmission of the signals was not an invasion of the privacy of others on the vessel. A key factor was that the informant had a right to be on the vessel at the

time the beeper was attached. Because there was no trespass, attaching the beeper did not constitute a search and transmission of the signals was not an invasion of privacy.

■ As in *Conroy*, this case involves a situation where the informant was not a trespasser. She had a right to be where she was. It cannot be said that a search occurred when the informant activated the beeper. Monitoring the signals does not constitute an invasion of privacy when one's movements are exposed to public view generally. *United States v. Dubrofsky*, 581 F.2d 208 (9th Cir. 1978). This situation is analogous to a case where an informant surreptitiously transmits his conversation with an unknowing lawbreaker by means of some mechanical device. The Supreme Court has held that transmission of the conversation does not constitute an invasion of privacy. *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

III. Deportation of Witnesses.

■ Marin next contends that she was denied her Fifth Amendment right to due process and her Sixth Amendment right to compulsory process when several of the witnesses were deported before the trial. This issue is governed by this court's recent decision in *United States v. Avila-Dominguez*, 610 F.2d 1266 (5th Cir. 1980). This court stated that an individual's constitutional rights are violated if an alien witness is deported before the defendant is given an *opportunity* to interview the witnesses. But even when constitutional rights are violated, this does not require automatic reversal and dismissal of the indictments when the case is flavored with an element of waiver and there is no showing of prejudice.

On December 27, 1978, fifteen people, including three coconspirators, were arrested in a Denver apartment after Marin had travelled from El Paso to Denver. At most, five of these undocumented aliens could be considered adults and the rest were children. Two of these adults eventually remained in the United States to testify at Marin's trial. The others were deported at a later time. On December 28, 1978, counsel was appointed for Marin. At a later time and in accordance with customary procedure, counsel was given oral and written notice 10 days in advance that the government planned to deport the potential witnesses. Counsel was also given the names of the witnesses. While the government interviewed these witnesses and any favorable evidence they discovered would be subject to disclosure as *Brady* material, the witnesses were never interviewed by counsel for Marin. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Marin was indicted in the United States District Court for the Western District of Texas on February 15, 1979. Again, in accordance with customary procedure, notice was given that the witnesses were about to be deported. On March 6, 1979, almost two months after the aliens were arrested, they were deported. Texas counsel was appointed on March 15, 1979, after the deportation of all but two of the witnesses.

This court stated in *Avila* that a "requirement that defendants act diligently to preserve the testimony of illegal aliens must be imposed on the circumstances of these cases. Otherwise, the great burden and expense of detaining and housing alien witnesses is borne by the Government, while defendants delay the simple efforts involved in locating and interviewing them." *Id.* 610 F.2d at 1269. Denver counsel for Marin failed to act diligently. Counsel was given the names of the witnesses and he knew where they were incarcerated. Counsel was given 10 days notice prior to deportation of the witnesses. The government interviewed the witnesses but there was apparently no effort made by counsel to acquire the fruits of these interviews. Counsel essentially impliedly waived his right to interview the witnesses or have them retained in the United States. *Cf. United States v. Lujan-Castro*, 602 F.2d 877 (9th Cir. 1979). But we do not have to decide this case on the basis of waiver. The

key question examined in assessing the constitutionality of the deportation is whether counsel had the *opportunity* to interview the witness. Unlike in *Avila*, we are not presented in this case with a situation where the deportation occurred ten days after the arrest. In *Avila*, counsel at least inquired about the names and location of the aliens. His only mistake was that he failed to follow up that informal inquiry. In this case, there was no inquiry or effort made by counsel to interview the witnesses. He was given an *opportunity* to do so when he was given 10 days notice and was supplied with the names and location of the aliens. He failed to take advantage of this *opportunity*.

This court in *Avila* also based its decision on the absence of any suggestion as to what testimony helpful to defendants the witnesses could offer. Reversal is not warranted where the record fails to provide any indication that the testimony of any of the deported aliens would be helpful to Marin. There must be an offering of at least some plausible theory of how the testimony of the witnesses would help Marin. *Id.* 610 F.2d at 1269–70.

As in *Avila*, there is nothing in the record which indicates that Marin was prejudiced by the unavailability of the alien witnesses at the time of the trial. Two of the witnesses were available. An opportunity was provided to confront the other witnesses. The only possible defense is that Marin was a passenger. But after twice being given her *Miranda* rights, Marin stated that she had been asked to guide several undocumented aliens to their destination, apparently Denver. She personally made arrangements with a woman and two children to transport them to their destination in the United States for a fee of $330 per person. A third party recruited other individuals and Marin agreed to guide them across the Rio Grande River to their destination in the United States. Marin has no plausible defense to offer. We conclude that Marin's constitutional rights were not violated because she was given an *opportunity* to interview the aliens. But even if her constitutional rights were violated, our decision in *Avila* requires that we uphold the decision of the district court in light of the presence of an implied waiver and the absence of a plausible defense.

AFFIRMED.