**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Carlos ARMIJO–MARTINEZ and Carlos Armijo-DeLeon, Defendants-Appellees.**

**No. 80–1798.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 14, 1981.

Decided Feb. 5, 1982.

James S. Brady, U. S. Atty., Agnes Kempker-Cloyd, Grand Rapids, Mich., Frank O. Bowman, III, Lauri Steven Filppu, Dept. of Justice, Gen. Litigation and Legal Advice Section, Washington, D. C., for plaintiff-appellant.

Michael W. Sefton, Norman Kravitz, Grand Rapids, Mich., for defendants-appellees.

Before LIVELY and KENNEDY, Circuit Judges, and PECK, Senior Circuit Judge.

LIVELY, Circuit Judge.

■ This appeal concerns the compulsory process guarantee of the Sixth Amendment. The first question is whether the government may, by its unilateral action, make material witnesses in a criminal prosecution unavailable to the defendant. We hold that such action by the government violates constitutional rights of the defendant. The second question is what showing must be made by a defendant who has suffered this constitutional deprivation in order to entitle him to judgment dismissing the charges against him. These issues have arisen frequently in other circuits in prosecutions for transporting or harboring illegal aliens. The Ninth and Fifth Circuits have dealt with them on a number of occasions, and the Seventh Circuit has done so in at least one case.

## I.

### A.

The defendants Carlos Armijo-Martinez (hereafter Martinez) and his son, Carlos Armijo-DeLeon (hereafter DeLeon) were arrested by agents of the Immigration and Naturalization Service (INS) near Pullman, Michigan on August 6, 1980. The agents had procured a search warrant for vehicles driven by the defendants on the basis of information that they were engaged in transporting illegal aliens to and from work on farms in the vicinity of Pullman. Both defendants are citizens of Mexico who have permanent resident alien status in the United States and live in the Pullman area. On the morning of the arrests INS agents saw a number of men getting into two vans, which were then driven away from the loading point by the defendants. When the vans were stopped by the agents, the one being driven by DeLeon was found to contain 13 men and the one driven by Martinez containing five male passengers. All appeared to be Hispanic. Concluding that all the passengers were illegal immigrants, the INS agents placed the two defendants and the 18 occupants of the vans under arrest.

Later in the day of their arrest the defendants gave statements to the agents. DeLeon's statement was written out by an agent in longhand and signed by DeLeon. The statement of Martinez was in question and answer form. Both statements contained admissions that the defendants knew their passengers were illegal aliens, and DeLeon's statement added that he knew some of the aliens had been in the United States for about one year. The 18 occupants of the vehicles were also interviewed. All admitted that they were in the United States illegally. The 18 illegal aliens were

searched and all their possessions were gathered up by the agents and inventoried. No documents were found on the person or among the possessions of any of the 18 which indicated that any of them were in the United States legally.

### B.

On the day following the arrests a criminal investigator for the INS filed a complaint against each of the defendants. Both complaints listed four of the illegal aliens, two from each van, as material witnesses. On the same day, August 7, 1980, each defendant made an "initial appearance" before a magistrate who set appearance bonds. At this initial appearance each defendant requested that an attorney be appointed to represent him. The following day, August 8th, letters were sent to two attorneys notifying them that they had been appointed to represent defendants. It is undisputed that Norman Kravitz, appointed to represent DeLeon, received his notification of appointment on August 11th, and that Michael Sefton received notice on August 12, 1980 that he had been appointed to represent Martinez.

On August 7th the government also made motions in each case requesting the court to set a cash bond for each of the four illegal aliens named as material witnesses in the complaints and who were being detained. In accompanying affidavits the INS criminal investigator stated that unless safeguards were imposed to avoid flight of each of the material witnesses, "It would be impracticable to secure his presence by subpoena as he would be in a country outside the United States." Bond for each of the witnesses was set at $1,000 and the four aliens were then committed to the Kent County jail as material witnesses. One of the four posted a $1,000 bond and was released on August 20th. The other three remained in jail for 43 days until bond was reduced to $50. At least one of the four was missing at the time of the hearing in district court. On August 8th the remaining 14 illegal aliens were sent by the government to Detroit, where they were offered, and accepted, voluntary departure in lieu of deportation. The 14 were then taken at government expense to El Paso, Texas, reaching there on August 10th. By August 12, 1980 all 14 were in Mexico.

### C.

On August 13, 1980 a federal grand jury indicted DeLeon on 13 counts of transporting an illegal alien within the United States in violation of 8 U.S.C. § 1324(a)(2),[1] and Martinez on five counts charging the same offense. Each count referred to one of the 18 illegal aliens and charged a violation which consisted of transporting the named alien within the United States.

The defendants were arraigned on August 25th. On September 26th both defendants filed motions to require the government either to produce the 14 illegal aliens or dismiss the indictment. A hearing on these motions, which consisted of statements by opposing counsel, was held by the district court. The government conceded that none of the 14 illegal aliens had been available since their return to Mexico on August 12, 1980.

---

1. 8 U.S.C. § 1324(a)(2) (1976) provides:

(a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law; any alien, including an alien crewman, not duly admitted by an immigra-

tion officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

Mr. Kravitz, the attorney for DeLeon, said that his client had stated he did not believe any of the 13 occupants of his van were here illegally and that his 11 passengers who had returned to Mexico could corroborate his claim. Kravitz had been told by DeLeon that some of the unavailable witnesses had shown DeLeon identifying information such as social security cards and immigration (green) cards which would support his claim that he did not know whether or not any were illegal aliens. Since all the aliens were staying together in a single room at DeLeon's residence, DeLeon felt that some of the missing witnesses should have seen others showing him such identification. The attorney was unable to substantiate his client's claims because he had had no opportunity to interview the aliens who had returned to Mexico. Mr. Kravitz argued that DeLeon's statement to the government agents was not a confession but at most an admission of some incriminating facts. He emphasized that the statement was written by the INS agent, not by DeLeon, and that DeLeon claimed many parts of it were not true.

Attorney Sefton, representing Martinez, stated that one of his passengers who had been permitted to return to Mexico had been the spokesman for the group and was the one who had contacted Martinez about finding work for them. The testimony of this witness was required to establish Martinez's claim that the five men had been working in a Chicago plant for a long time and had come to Michigan when the plant had closed. He also contended that the admissions in his client's statement did not constitute a confession.

The assistant United States attorney argued that the statements of the defendants, which the government considered to be confessions, were directly contrary to the claimed need for the witnesses, since both defendants admitted they knew the people they were transporting were illegal aliens. The government attorney pointed out that counsel for the defendants had taken no steps to depose the four detained witnesses because they wanted these witnesses to testify at the trial. Actually Kravitz had interviewed three of the detained witnesses prior to the hearing. Arguing a theory of waiver, the prosecutor stated that interest of defense counsel in the 14 aliens who had returned to Mexico "heightened" only when they learned that the 14 were gone. The government attorney expressed her concern about the due process rights of persons who are detained for long periods as witnesses without being charged with an offense. At the conclusion of her statement the prosecutor admitted to the court that the government would be unable to produce any of the 14 for trial.

### D.

The district court expressly found that the defendants had not waived their right to the testimony of the 14 missing witnesses. The court found that the witnesses became unavailable before defense counsel had an opportunity to interview them or attempt to delay their voluntary departure. Further, the defendants could not know what these persons might say about their cases because of the lack of opportunity for their lawyers to interview them. Since the 14 were eyewitnesses to the events which were the basis of the charge, they were material witnesses. Under these circumstances the district court found that the missing witnesses could conceivably benefit the defendants and that counsel had made at least the "slightest suggestion" that testimony of the 14 would be helpful to both defendants. The court found that the confessions were immaterial to his decision since the defendants could not be convicted on the basis of the confessions alone. Concluding that the Sixth Amendment right of the defendants to compulsory process had been denied by the unilateral act of the government, the district court granted the motions and dismissed the indictments, and the government appealed.

### II.

The district court stated that it was applying the rationale followed by the Ninth

and Seventh Circuits which had decided similar cases. The Ninth Circuit was the first to speak. In *United States v. Mendez-Rodriguez*, 450 F.2d 1 (1971), a prosecution for transporting illegal aliens, three of six eyewitness aliens were returned to Mexico after being interviewed by INS agents. At a hearing on a motion to require the government to produce the three returned witnesses or to dismiss the indictment, the government conceded that it could not produce the witnesses. It was shown that defense counsel had no opportunity to interview the eyewitnesses before they were returned to Mexico. The district court denied the motion, and the defendant was convicted. The conviction was reversed on appeal because the government by its action had deprived the defendant of an opportunity to interview eyewitnesses to the event which was the basis of criminal charges against him and had put the witnesses beyond the reach of the court's subpoena power. The government's acts were found to violate the due process guarantee of the Fifth Amendment and the compulsory process guarantee of the Sixth Amendment.

In *United States v. Tsutagawa*, 500 F.2d 420 (9th Cir. 1974), the court was confronted with a similar set of facts. Out of 39 illegal aliens arrested in a raid, all but four were released to Mexico before the defendants or their attorneys had an opportunity to interview them. All of the 35 who were released had either been interviewed by government agents or had testified before a grand jury before returning to Mexico. The remaining four were either paroled into the United States or kept in custody. In affirming the district court's dismissal of the indictments, the court stated:

> The trust of *Mendez-Rodriguez* is to prevent the basic unfairness of allowing the government to determine which witnesses will not help either side and then to release those witnesses, for all practical purposes, beyond the reach of the

defendant. *Compare United States v. Romero*, 469 F.2d 1078 (9th Cir. 1972), cert. denied 410 U.S. 985, 93 S.Ct. 1512, 36 L.Ed.2d 182 (1973). The vice lies in the unfettered ability of the government to make the decision unilaterally. The Sixth Amendment guarantees a defendant the right to subpoena favorable witnesses. *Washington v. Texas*, 388 U.S. 14, 18–19, 87 S.Ct. 1920, 1922–23, 18 L.Ed.2d 1019 (1967). Here, the government placed witnesses, who may have been favorable to the appellees, outside the power of our courts to require attendance. In *Mendez-Rodriguez* we held that this same act denied the accused due process because it interferred with his ability to defend himself from criminal charges. 450 F.2d at 4–5. A defendant has the right to formulate his defense uninhibited by governmental conduct that, in effect, prevents him from interviewing witnesses who may be involved and from determining whether he will subpoena and call them in his defense.

> Having based our decision in *Mendez-Rodriguez* on the Fifth and Sixth Amendments, we must be careful not to make an artificial distinction which in actuality fails to mandate a different constitutional result.

*Id.* at 423.

*United States v. Valenzuela-Bernal*, 647 F.2d 72 (9th Cir.), cert. granted, —— U.S. ——, 102 S.Ct. 501, 70 L.Ed.2d 377 (1981), involved an indictment for transporting a single illegal alien. However, at the time of the defendant's arrest three illegal alien passengers from his vehicle were captured. All were interrogated and none offered any information exculpatory of the defendant. Two of the aliens were deported to Mexico and the one named in the indictment was detained. In discussing its earlier decision the court set forth the essential elements of *Mendez-Rodriguez* as distilled from a survey of its "progeny"[2] to be "(1) unilateral

---

**2.** The court discussed several of its opinions where dismissal was denied because the government had not taken unilateral action to make witnesses unavailable, the defendants

had an opportunity to interview the witnesses before they became unavailable, or the missing persons were not potential witnesses to the criminal act. All of the cases were distin-

Government action denying a defendant access to a witness; and (2) prejudice; *i.e.*, loss of a conceivable benefit to the defendant from the missing witness's testimony." (Footnote omitted). *Id.* at 75. The court found that the defendant had demonstrated that he could conceivably benefit from the testimony of the unavailable witnesses and reversed the district court's denial of the motion to dismiss. Though the government appears to argue that in *Valenzuela-Bernal* the Ninth Circuit has retreated from its *Mendez-Rodriguez* decision by requiring a showing of prejudice, we do not so view the later decisions of that court. We have found no case from the Ninth Circuit where unilateral action by the government which had made an eyewitness unavailable has been held non-prejudicial.

In its only reported decision on the subject the Seventh Circuit has adopted the rule and reasoning of the Ninth. In *United States v. Calzada*, 579 F.2d 1358 (7th Cir.), *cert. dismissed*, 439 U.S. 920, 99 S.Ct. 294, 58 L.Ed.2d 266 (1978), the court made it clear that dismissal is not required in every case where a potential alien witness somehow becomes unavailable. However, upon finding that the government had acted affirmatively to make three of 13 alien witnesses unavailable, the court in *Calzada* concluded that dismissal was required. The court also held that the defendant was not required to show prejudice, since such a requirement would "emasculate the defendants' right to compulsory process" in cases of this kind.

> Since no defendant could ever be able to show with any degree of assuredness what a witness whom he has never interviewed might say on his behalf, a demonstration of prejudice will be impossible.

*Id.* at 1362.

While agreeing with the Ninth and Seventh Circuits that a criminal defendant's constitutional rights are violated when an alien is deported[3] before the defendant is given an opportunity to interview the witness, the Fifth Circuit holds that dismissal is not the automatic remedy for this violation. *United States v. Avila-Dominguez*, 610 F.2d 1266 (5th Cir. 1980). In that case the court found that the defendant had not made "the slightest suggestion" of what testimony the absent witnesses could offer that would be helpful to the defendant. *Id.* at 1269. The court agreed with the Seventh Circuit in *Calzada* that the defendant need not show prejudice with "any degree of assuredness," but required "at least a plausible theory" of how the testimony of the missing witnesses would help the defense. *Id.* at 1269–70. It could discern no such plausible theory and affirmed the district court's denial of the defendants' motion to dismiss. Dismissal was also denied in *United States v. Arredondo-Morales*, 624 F.2d 681 (5th Cir. 1980), where defense counsel were found to have failed to take advantage of opportunities to obtain testimony of potential witnesses. The court noted, however, that even if there had been a constitutional violation (no opportunity to interview afforded before deportation), dismissal would not have been warranted because there was nothing in the record to indicate that the defendant had been prejudiced. In *United States v. Henao*, 652 F.2d 591 (5th Cir. 1981), the court found there had been no constitutional violations since the missing witness had merely "skipped"; the witness had not been made unavailable by unilateral government action. Nevertheless the court reviewed its earlier decisions and concluded it had "set a very low threshold for prejudice." *Id.* at 593.

## III.

### A.

■ All courts which have considered the issue agree that a constitutional violation

---

guished from the case then under consideration. 647 F.2d at 74–75 nn. 1–3.

**3.** We agree with the Ninth Circuit that there is no distinction between deportation of an alien witness and the government's facilitating the return of a witness to a foreign country volun-

tarily where its action prevents a defendant from interviewing the witness before trial. See *United States v. Gonzales*, 617 F.2d 1358, 1363 (9th Cir.), *cert. denied sub nom. Patel v. United States*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980).

occurs when the first "essential element" of *Mendez-Rodriguez* is found. The record in the present case makes it clear that there was a violation. The government had total control over the 14 eyewitnesses. After obtaining the information it desired from them, the INS offered them voluntary departure and paid the expenses of their return to Mexico. The witnesses were in Mexico, or in the process of entering that country, when counsel for the defendants were notified of their appointments. There was absolutely no opportunity for defendants or their counsel to learn from the witnesses what testimony they might be able to give at trial. The violation having been established we turn now to a consideration of the second "essential element"—prejudice.

### B.

█ The government urges us to require a showing of prejudice and argues that the defendants in the present case have failed to establish prejudice because they have not made the "slightest suggestion" of what testimony of the missing witnesses might be helpful to them. Though some showing of prejudice is required, we agree that a "very low threshold" properly defines the burden of a defendant in these cases. The inescapable fact is that no one knows what a witness may have observed or heard until he or she has been interviewed.

Chief Justice John Marshall confronted the scope of the compulsory process clause while sitting as a circuit judge in the treason and misdemeanor trials of Aaron Burr.[4] Marshall stated, "[t]he right given by this article must be deemed sacred by the courts, and the article should be so construed as to be something more than a dead letter." *United States v. Burr*, 25 F.Cas. 30, 33 (No. 14,692d) (C.C.D.Va.1807). The cases against Burr arose out of a message of President Thomas Jefferson to Congress in which Burr was charged with planning to establish a separate government west of the Alleghenies. The charge was based on the contents of some letters written by General James Wilkinson in New Orleans. After he was indicted Burr made a motion that Jefferson be subpoenaed to produce one of the Wilkinson letters which he had referred to in his message. One of the grounds upon which the government opposed the motion was that Burr had not shown precisely how he intended to use the letter. Chief Justice Marshall held that Burr was required only to show that the letter might prove useful in impeaching a probable witness at the trial. To require a greater showing "before he knows positively what the witness will say" would be unreasonable. 25 F.Cas. at 36. The Chief Justice delineated the problem of requiring a showing of prejudice in cases where a defendant has not had an opportunity to know the content of the evidence whose production he is seeking to compel: "Now, if a paper be in possession of the opposite party, what statement of its contents can be expected from the person who claims its production, he not precisely knowing its contents?" *United States v. Burr*, 25 F.Cas. 187, 191 (No. 14,694) (C.C.D. Va.1807).

In one of the few cases in which the Supreme Court has dealt with the compulsory process clause, Chief Justice Warren wrote in *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967):

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

█ We conclude that the district court properly determined that the defendants DeLeon and Martinez had made sufficient showing of prejudice. They articulated the

**4.** See Western, *The Compulsory Process Clause*, 73 Mich.L.Rev. 73, 101–108 (1974).

issues and identified the type of evidence which they intended to develop—the existence of some facts which would negate a finding that they had knowledge that their passengers were illegal aliens who had been in the United States less than three years. We also agree with the district court that the statements of the defendants to the INS agents do not have the significance attached to them by the government; they are not conclusive of guilt. A defendant in a criminal case always has the right to disavow an out-of-court statement and attempt to convince a jury that it does not accurately reflect what was actually said. Finally, we reject completely the implied suggestion that since the government agents turned up nothing favorable to the defendants in their interviews with the 14 witnesses, it would be pointless for the defendants' attorneys to interrogate them. Defendants are entitled to have their defense prepared and shaped by their own attorneys, not by agents of the government.

### C.

The government also argues that we need not decide this case on the basis of decisions by other courts in illegal alien cases. It maintains that there are controlling principles from other types of prosecutions which should guide us. The government relies particularly upon this court's decision in *United States v. Barker*, 553 F.2d 1013 (6th Cir. 1977). In *Barker* the defendants subpoenaed several government employees who had been engaged in investigating the crime with which they were charged. Though the court issued the subpoenas at government expense pursuant to Rule 17(b), Fed.R.Crim.P., they were never served by the marshal, and the witnesses did not appear. This court held that the defendants were deprived of a fair trial. Though written reports of the investigations by these witnesses were available, the defendants were found to have made a showing that their live testimony was necessary to an adequate defense. The court stated the test for determining "necessity" under Rule 17(b):

... the appropriate standard is whether defendants have alleged that the witnesses will testify about facts that are relevant to any issue in the case.

*Id.* at 1021.

It can hardly be argued that eyewitness evidence in a criminal prosecution is not "relevant to any issue in the case." Though *Barker* was decided under Rule 17(b), the court noted that Sixth Amendment rights were involved. To the extent that constitutional rights were considered in *Barker*, we find nothing in its holding or its discussion of the issues which is inconsistent with our holding in the present case. In *Barker* the witnesses sought to be subpoenaed had submitted written reports which set forth the results of their investigations. Even though the defendants could have relied upon these reports, the court held they were not required to do so, but were entitled to have live testimony at their trial. The instant case presents a much stronger showing of necessity. Because the government made it impossible for the defendants or their attorneys to know what testimony might be forthcoming from the missing witnesses, the showing of need for the witnesses made at the hearing was sufficient.

The government also relies on *United States v. Mosca*, 475 F.2d 1052 (2d Cir.), *cert. denied*, 412 U.S. 948, 93 S.Ct. 3003, 37 L.Ed.2d 1001 (1973). In that case the government had facilitated the departure of a potential witness from the United States. However, in considering motions for a new trial, following guilty verdicts, the district court ordered the witness's testimony to be taken before an American Vice-Counsul in London, England and directed the government to reimburse defendants' counsel for the expenses of attending. After reading the entire deposition, the court of appeals determined that the defendants had failed to show any prejudice from their inability to call the missing witness to testify at trial. Under these circumstances the court found that any denial of the defendants' right to compulsory process was harmless error. 475 F.2d at 1058 n. 15. *Mosca* cannot be deemed authority for reversing the

judgment in the present case. The most obvious distinction is that the whereabouts of the 14 Mexicans is unknown to the government and it cannot produce them for deposition or trial. There is no way to determine what their testimony might be.

### D.

Finally, the government contends that even if a constitutional violation was shown in this case, the drastic remedy of dismissing the indictment was not justified. This argument rests almost entirely upon the recent decision of the Supreme Court in *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). *Morrison* involved the violation of a different Sixth Amendment guarantee—the right to counsel. There agents of the Drug Enforcement Agency talked with a defendant out of the presence of her retained counsel and attempted to undermine the attorney-client relationship. The court of appeals held that this Sixth Amendment violation required dismissal. The Supreme Court reversed, holding that remedies for violation of Sixth Amendment rights "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." 449 U.S. at 364, 101 S.Ct. at 668. After reviewing a number of its earlier decisions the Court summarized its past treatment of infringements of the right to counsel as follows:

> Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, *which can go forward with full recognition of the defendant's right to counsel and to a fair trial.*

*Id.* at 365, 101 S.Ct. at 668 (emphasis added).

The holding in *Morrison* was:

> ... absent demonstrable prejudice or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.[2]

[2] There is no claim that there was continuing prejudice which, because it *could not be remedied by a new trial or suppression of evidence*, called for more drastic treatment....

*Id.* at 365–66, 101 S.Ct. at 668 (emphasis added). We have emphasized the language in *Morrison* which we feel distinguishes it from the present case. Where any less drastic remedy than dismissal will preserve a defendant's right to a fair trial, society's interest in the administration of criminal justice requires that the less drastic remedy be employed to that end. However, when the constitutional violation is such that the criminal proceedings cannot go forward without continuing the violation, dismissal is the appropriate remedy. This is such a case. The adverse impact of the government's unilateral action upon these criminal proceedings cannot be removed by any remedy short of dismissal. We believe the district court tailored relief appropriate to the continuing prejudicial effect of the violation.

### IV.

We have held that the defendants in the present case crossed over the "very low threshold" for showing prejudice. Society's interest in avoiding aborted criminal prosecutions can be served by a change in the government's procedures following arrests for violation of 8 U.S.C. § 1324. The government could adopt the practice of giving immediate notice to counsel for defendants in such cases of its intent to deport or grant voluntary departure within a certain time to illegal aliens who are material witnesses. Counsel could be told of the proposed date of deportation or departure and informed that the witnesses would be available for interviews until that date. Having given notice, the government would furnish appropriate facilities for the interviews.

After interviewing the witnesses counsel could then apply to the district court for detention of those aliens whose testimony is considered necessary for a defense. If the government failed to agree on necessity, the district court would hold a hearing on the record and issue appropriate orders. In this way the necessity for the witnesses could be determined on appeal as in *Barker* and *Mosca, supra.*

■ The district court's practice of notifying counsel by mail of their appointment added to the problem in the present case. Here counsel had no opportunity to talk with the eyewitnesses because they were either in Mexico or at the border when counsel were notified of their appointments. The better practice would be to notify counsel by telephone immediately after the appointments are made so they will be able to move quickly in any case where the government intends to deport or facilitate the departure of alien witnesses. We will not hesitate to apply waiver principles where it appears that a defendant or counsel have not acted diligently to learn whether the persons scheduled for departure are actually "witnesses in his favor" whom he is entitled to obtain by compulsory process under the Sixth Amendment. However, when a defendant has been deprived by unilateral action of the government of any opportunity to learn what the testimony of a material witness would be, if available to testify, we hold that the requirement of prejudice is satisfied by a showing which identifies the relevant issues about which the missing witness might reasonably be assumed to have knowledge. A finding that a defendant could conceivably benefit from the testimony of such a witness is not foreclosed by *ex parte* statements of such witnesses to government agents where counsel for the defendant had no opportunity to cross-examine.[5]

The judgment of the district court is affirmed.

KENNEDY, Circuit Judge, dissenting.

I agree with the majority that in its efforts to deal promptly with a large number of illegal aliens, the government in this case inadvertently violated defendants' rights to compulsory process under the Sixth Amendment. I respectfully disagree with the majority's conclusion that dismissal of the indictments is the appropriate remedy on the record now before us. In *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981), a unanimous Supreme Court held that "absent *demonstrable prejudice*, or *substantial* threat thereof, dismissal of the indictment is plainly inappropriate" as a remedy for even a deliberate violation of constitutional rights (emphasis added.)[1] Though parts of the majority's opinion read as if a defendant must show prejudice before the indictment against him will be dismissed where the government has made potential witnesses unavailable, the language of the announced holding and the majority's treatment of the facts of this case demonstrate clearly that under the majority's analysis no meaningful showing of prejudice is required.

5. We consider the dissent's reliance on *Morrison* to be misplaced. In *Morrison* it was possible to "neutralize the taint" of the constitutional violation and then proceed with the trial. That opportunity was not presented in this case. Because the eyewitnesses had already been put beyond the reach of the defendants and their counsel by unilateral action of the government, the Sixth Amendment rights of the defendants could be preserved only by dismissal. The dissent, like the government, attributes too little importance to the role of defense counsel. As the Supreme Court said in *Dennis v. United States*, 384 U.S. 855, 875, 86 S.Ct. 1840, 1851, 16 L.Ed.2d 973 (1966), "The determination of what may be useful to the defense can properly and effectively be made only by an advocate." (Footnote omitted).

1. The majority distinguishes *Morrison* on the ground that here, unlike in *Morrison*, any prejudice cannot be remedied by a sanction short of dismissing the indictment. At 1139, 1140 n.5. Under *Morrison*, though, a finding of prejudice is a necessary prerequisite to dismissal of the indictment, or to any other remedy for that matter. 449 U.S. at 365, 101 S.Ct. at 668; *id.* at n.2. As set out below, I disagree with the majority on whether prejudice was shown here. On the necessity of some showing of actual prejudice before dismissal of an indictment is warranted, *Morrison* is not distinguishable from this case.

The majority states its holding as follows: "[W]e hold that the requirement of prejudice is satisfied by a showing which identifies the relevant issues about which the missing witness might reasonably be assumed to have knowledge." at 1140. *Any* eyewitness to a crime can reasonably be assumed to have knowledge about the crime. The majority would not even require an allegation that the witness have knowledge favorable to the accused. Under the majority's announced holding a defendant need only show an eyewitness is unavailable because of government action in order to win dismissal of the indictment, no matter how unlikely it is that the witness could actually benefit the defendant. *Morrison* requires more than this before dismissal of the indictment is warranted.

The majority "conclude[s] that the district court properly determined that the defendants DeLeon and Martinez had made sufficient showing of prejudice" to warrant dismissal of the indictments. at 1137. The District Court refused to inquire whether the missing witnesses would be of help to defendants. It made no findings of fact on whether defendants were actually prejudiced in the case. Defendants did not testify at the hearing held on defendants' motion to dismiss the indictment. Nor did they file affidavits. The only claim of prejudice was a suggestion by counsel for DeLeon that, according to his client, the missing witnesses might testify that the aliens still remaining in this country showed him evidence of their lawful status here. This statement of DeLeon through his counsel was not subject to cross-examination. It was not made under oath. No protection existed against the possibility that DeLeon was lying or that there was no basis for his supposition.

Deciding without the benefit of *Morrison*, the District Court reviewed cases from the Fifth, Seventh, and Ninth Circuits that have dealt with this same issue, all of which, of course, were also decided before *Morrison*.[2] On the basis of the above and the government's representation that the witnesses were in fact unavailable, the court concluded that the other circuits' standards for dismissal of the indictment were satisfied here. The unavailable aliens were eyewitnesses to the crime. *See United States v. Calzada*, 579 F.2d 1358 (7th Cir.), *cert. dismissed*, 439 U.S. 920, 99 S.Ct. 294, 58 L.Ed.2d 266 (1978). The missing witnesses "could conceivably aid" the defendants. *See United States v. Gonzales*, 617 F.2d 1358, 1363 (9th Cir.), *cert. denied sub nom. Patel v. United States*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). Defendants made the "slightest suggestion" that the missing witnesses would aid their defense. *See United States v. Avila-Dominguez*, 610 F.2d 1266 (5th Cir. 1980).[3]

It is difficult to imagine a case where it would *not* be "conceivable" that a missing eyewitness could help a defendant or where the "slightest suggestion" of such help could not be made. Because the District Court did not consider the likelihood the missing witnesses could actually benefit the defendants, its decision cannot be the equivalent of a finding that the defendants were prejudiced, unless "prejudice" is defined so broadly as to be meaningless. The majority's treatment of the District Court's opinion makes it clear that automatic dismissal of the indictment is required whenever the government has made eyewitnesses unavailable.

I can think of no better way to illustrate the error in the majority's opinion than

2. I am aware of only one case decided after *Morrison* that addresses the question we have here. In *United States v. Valenzuela-Bernal*, 647 F.2d 72 (9th Cir. 1981), the Ninth Circuit, without even mentioning *Morrison*, followed its precedent to dismiss an indictment despite the absence of any significant showing of prejudice. The Supreme Court has granted certiorari in this case. —— U.S. ——, 102 S.Ct. 501, 70 L.Ed.2d 377 (1981).

3. The District Court misinterpreted the Fifth Circuit's holding in *Avila-Dominguez*. The court refused to dismiss the indictment because the defendant did not make the "slightest suggestion" that an unavailable witness would help him. This is not the same as holding that dismissal would be granted where a defendant did make the slightest suggestion of a possible benefit.

with the facts of this case. DeLeon was initially charged with thirteen counts of knowingly transporting an illegal alien and Martinez was charged with five. All counts were dismissed by the District Court. The government appeals the dismissal of only those four counts charging the defendants with knowingly transporting the four illegal aliens who are still in this country.

The only suggested defense available to the defendants is that they did not· have knowledge that the four remaining aliens were here illegally. Although counsel for DeLeon claimed to have interviewed the two remaining aliens his client is charged with transporting, he did not claim that those aliens, who would best know whether they showed DeLeon any documentation, would support DeLeon's claim that they showed him documentation of their lawful presence here. In his brief on appeal DeLeon admits that these remaining aliens would not support him.

Further, both Martinez and DeLeon gave lengthy confessions admitting that none of the aliens had any papers showing their lawful presence in this country, admitting that the defendants knew the aliens they transported were here unlawfully, and detailing defendants' extensive involvement with the illegal aliens. The majority attaches little significance to the confessions because they are not conclusive of guilt and defendants have the right to try to convince the jury of their unreliability. This is true but is not dispositive on the issue of prejudice. Unless some challenge is made to the confessions they at least demonstrate how unlikely it is that any of the unavailable witnesses would testify that the aliens still here did show the defendants documentation of their lawful presence. This is especially true if the remaining aliens will not themselves corroborate the defense. The confessions could appropriately be challenged at a hearing on prejudice, but no such hearing was held.

Martinez's case is particularly striking. Although counsel for DeLeon suggested how his client might be harmed by the removal of the witnesses, no significant claim has been made that the missing witnesses would be of any use to Martinez.[4] Martinez was convicted of smuggling illegal aliens once before, in 1978. Apparently among the aliens Martinez was convicted of smuggling at that time was one Tiburcio Hernandez-Alvarez. In this case Martinez is charged with knowingly transporting this same Hernandez-Alvarez and Hernandez-Alvarez is one of the illegal aliens still in this country. I am unable to see how, in any meaningful sense, Martinez could be "prejudiced" in his defense against the charge of knowingly transporting Hernandez-Alvarez by the lack of other witnesses. No matter what those other witnesses could state as to what Martinez was told to support Hernandez-Alvarez's legal status in this country, because of Martinez's prior involvement with him Martinez must almost certainly be found to have known that Hernandez-Alvarez was here illegally. However, under the majority's standard, the indictment against Martinez for transporting Hernandez-Alvarez must be dismissed, because the government's act in making eyewitnesses unavailable has so "prejudiced" him that he cannot get a fair trial. I cannot accept this result either as an exercise of common sense or as good law under *Morrison.*

The majority asserts without explanation that no remedy short of dismissal would cure the prejudice caused by unavailable witnesses. In *Morrison, supra,* 449 U.S. at 364, 101 S.Ct. at 668, the Supreme Court stated:

> Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.

---

4. The one statement made on behalf of Martinez was made by his attorney who only said that he would like to talk to the now unavailable illegal alien who arranged to bring the other aliens to Michigan. Counsel did not explain how this talk would be of any benefit at all to his client's defense.

An instruction to the jury that the testimony of the absent witnesses would be unfavorable to the government would probably remedy some degrees of prejudice.

I would remand this case to the District Court for a hearing on whether either defendant has demonstrated prejudice or substantial threat thereof by the departure of the aliens. Defendants should be required to make some threshold showing that the departed aliens could provide evidence material to their defense. The court could then require the government to show by a preponderance of the evidence that defendants were not prejudiced under the totality of the circumstances. If specific prejudice is identified the District Court should consider whether a sanction less severe than dismissal of the indictments can provide the necessary cure.

I fully endorse the majority's admonition to the District Court to act more promptly where defendants are in custody in notifying appointed counsel of their appointments.