**UNITED STATES of America, Plaintiff,**

v.

**Charles V. TAYLOR, Defendant.**

**Crim. A. No. 81–80518.**

United States District Court,
E. D. Michigan, S. D.

March 18, 1982.

Blanche Bruce, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Paul D. Borman, Federal Defender, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

On October 9, 1981, the Government filed a Complaint with this Court, claiming that Defendant, Charles V. Taylor, "did knowingly possess in and affecting commerce, aided and abetted by Irvin Moore, a firearm, to wit: one Plainfield .30 caliber carbine bearing serial number 77459 after having been previously convicted of a felony," in violation of Title 18, U.S.C. § 2(a) and App. § 1202(a)(1). The Government also alleged that Defendant sold the firearm to Special Agents Don Hightower [Hightower] and Tom Dykstra [Dykstra], both of the Federal Bureau of Alcohol, Tobacco and Firearms [ATF], while they were acting in an undercover capacity. The Complaint notes that during the transaction, Defendant claimed that the subject firearm was owned by Samuel H. Luckett [Luckett]. After a discussion regarding price, Defendant left the undercover agents, for the ostensible purpose of speaking with Luckett. He then returned to the undercover location and sold the firearm to Hightower and Dykstra.

On November 3, 1981, Defendant was indicted pursuant to 18 U.S.C.App. § 1202(a)(1); to wit, Felon in Possession of a Firearm. The Indictment stated that Defendant "having been convicted on November 14, 1975 by a Washtenaw County Circuit Court in Michigan, of manslaughter, a felony, did knowingly receive and possess in commerce and affecting commerce, a firearm, that is: a Plainfield .30 caliber carbine, serial number 77459; in violation of § 1202(a)(1), Title 18, Appendix, U.S. Code." On November 18, 1981, Defendant filed a Motion to Disclose and Produce Government Informant. At the conclusion of a scheduled oral argument, this Court, on January 7, 1982, granted, in part, and denied, in part, Defendant's Motion. Specifically, the Order provided that "(1) (t)he Government will disclose to the Defendant the identity of the informant used in its case. (2). (T)he Government will use its best efforts to locate its informant. (3) (I)f the Government locates the informant and establishes his presence, it will then be necessary for the Defendant to produce him by subpoena for trial. The Government need not produce the informant for the Defendant. (4) (T)he Government shall file a writ-

ten report by 4:00 p. m. on Wednesday, January 6, 1982, advising the Court and defense counsel of the efforts and results of its efforts to locate the informant. (5) (I)f the Government has not located the informant, this Court will consider making a subsequent determination on this matter.

In a letter, dated January 6, 1982, the Government advised this Court that (1) Billy Jo Salisbury [Salisbury] is the name of the informant who was used in the criminal investigation of Defendant, and (2) the Government has been unable to locate Salisbury.

■ On January 21, 1982, Defendant filed a Motion to Dismiss Indictment for Violation of Defendant's Rights to Compulsory Process and to a Fair Trial—Evidentiary Hearing Requested. In his Motion, Defendant argued that the Government, by "facilitating the absence of its undercover informant, Billy Salisbury, a witness vital to the defense," deprived him of his Constitutional rights to compulsory process and to a fair trial. As the result of an Evidentiary Hearing which was held before this Court on February 6, 1982, the Court makes the following Findings of Fact. In July, 1981, a Joint Task Force, which was composed of representatives from ATF and the Washtenaw Area Intelligence Team [WAIT], planned a "sting" operation that would take place in the Ypsilanti, Michigan area. Acting through Ypsilanti Police Detective E. Hall [Hall], the Joint Task Force employed Salisbury to act as an undercover informant in July, 1981. Salisbury was given assurances by several Joint Task Force members that the operation would be conducted in such a manner that his testimony would not be required in any case brought as a result of their operations. From July, 1981 through October, 1981, the Joint Task Force paid Salisbury in excess of $1,000.00 in small amounts, usually less than $4.00 per day, with the understanding that the payments were for subsistence.

On August 26, 1981 (the date of the alleged offense), Luckett sought to borrow money from Defendant "to help get his sister Connie Luckett out of jail on bail."

Defendant, who had known Connie Luckett for fourteen years, was a close friend of the entire Luckett family. Although Defendant did not have the necessary funds to gain. Connie Luckett's release, he was aware that her brother possessed a firearm. Defendant suggested that if Luckett wanted to sell his firearm, he believed that Salisbury knew of someone who might buy it. Luckett decided to sell his firearm.

Thereafter, Defendant, Luckett, and one Irvin Moore [Moore] proceeded to Luckett's home, where Luckett picked up his rifle. Defendant telephoned Salisbury from Luckett's house, and told him that his "good friend" had a rifle that he desired to sell. Defendant told Salisbury that Luckett was interested in selling his firearm in order to get enough money which would enable his sister, Connie, to be released from jail on bond. Defendant also informed Salisbury of his long time friendship with Connie Luckett. Salisbury offered to contact "his friend, Don" to determine whether he was interested in buying the firearm. Moments later, Salisbury telephoned Defendant and notified him that (1) "Don was in," and (2) if Defendant would "pick him up . . . he'd take [him] to Don's." Luckett, Moore and Defendant, after picking Salisbury up at his home, proceeded to the Glencoe Apartments in Ypsilanti, the site of the Joint Task Force "sting" operation.

Upon arriving at the Glencoe Apartments, Luckett got out of the pickup truck, and reached behind the seat of the truck to get his firearm. However, Salisbury intervened, saying "they won't do business with you because they don't know you." Salisbury indicated that only Defendant should attempt to sell the firearm because (1) Defendant was the only member of the group (excluding Salisbury) who had met "Don" and (2) "Don" was unwilling to purchase firearms from strangers.

Ultimately, Defendant took the rifle to the apartment and met "Don" (to wit, Hightower), who made an offer to purchase the weapon. Defendant immediately left the apartment, and returned to the pickup truck, where he asked Luckett if the offer

was satisfactory. Luckett was satisfied with the offer, and agreed that Defendant should sell the firearm at the offered price of $150.00.

On October 8, 1981 (the date of Defendant's arrest), ATF agents learned that threats of physical harm had been made against Salisbury; however, they had no reason to suspect that Defendant was responsible for the threats. Thereafter, on October 10, 1981, ATF Agent Philip Oppenheim [Oppenheim] purchased a plane ticket from Detroit, Michigan to Fort Lauderdale, Florida for Salisbury. Oppenheim gave the ticket, together with $1,000.00 in cash, to Hall, with instructions that he deliver them to Salisbury. The cash, which was given by Oppenheim to Salisbury, was a "reward" for a "job well done."

On October 19, 1981, a Preliminary Examination was held in the instant case, at which time, Defendant claimed that "entrapment has occurred." Defendant requested the Government to state whether Salisbury, whom he believed to be a crucial witness to his entrapment defense, was an informant. Thereafter, on October 26, 1981, Oppenheim purchased plane tickets from Detroit, Michigan to California, which were given to Hall, with instructions that he give them to Salisbury's wife and child.

In early December, 1981, Hall, who served as the Joint Task Force's primary contact with Salisbury, spoke with Salisbury by telephone, but did not advise Salisbury to return to the Detroit area to testify.

The Supreme Court, in *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), held that the right to compulsory process, which is guaranteed by the Sixth Amendment, is a fundamental element of due process of law and, as such, it should be interpreted broadly. *See generally, Westen*, The Compulsory Process Clause, 73 Mich.L.Rev. 71, 113–15 (1974). In so holding, the Court recognized that:

> [t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as

well as the prosecution's to the jury so it may decide where the truth lies.

388 U.S. at 19, 87 S.Ct. at 1923.

In the case of *United States v. Mendez-Rodriguez*, 450 F.2d 1 (9th Cir. 1971), the United States Court of Appeals for the Ninth Circuit elaborated on the significance, and applicability, of the Fifth and Sixth Amendment rights to compulsory due process. In *Mendez-Rodriguez, supra*, Defendant was indicted for transporting seven illegal aliens. The Government detained three aliens and deported the others to Mexico without affording Defendant the opportunity to interview them. At trial, Defendant testified that he was unaware that the passengers in his car were illegal aliens. The three aliens testified that they were Mexican Nationals, who had entered this country without inspection, and that Defendant stopped his car and gave them a ride. Mendez-Rodriguez was convicted. In reversing the conviction, the Ninth Circuit held that the Government's action, in placing potential alien witnesses beyond the Court's subpoena power before Defendant was afforded an opportunity to interview and subpoena them, violated his Fifth Amendment right to due process and Sixth Amendment right to compulsory process. The considerations, which prompted this decision, were more fully explained by the Ninth Circuit in the case of *United States v. Tsutagawa*, 500 F.2d 420 (9th Cir. 1974):

> The thrust of *Mendez-Rodriguez* is to prevent the basic unfairness of allowing the government to determine which witnesses will not help either side and then to release those witnesses, for all practical purposes, beyond the reach of the defendant. [citations omitted] The vice lies in the unfettered ability of the government to make the decision unilaterally.... A defrmulate his defense uninhibited by government conduct that, in effect, prevents him from interviewing witnesses who may be involved and from determining whether he will subpoena and call them in his defense.

Id., at 423.

The *Mendez-Rodriguez, supra*, doctrine sweeps broadly. As the dissent in that case

pointed out, the Court did not impose a requirement upon an accused to establish (1) that specific prejudice was caused by the unavailability of the material witnesses, 450 F.2d at 5, or (2) the existence of Government misconduct or negligence, *id.*, at 6. In fact, Defendant, in *Mendez-Rodriguez, supra*, conceded that he was unable to show that the missing witnesses would have offered testimony favorable to the defense. The Ninth Circuit found Defendant's concession:

> understandable in view of the fact that appellant was, by government action, deprived of the opportunity to interview said witnesses. Appellant couldn't know what these witnesses might say, if anything. We are in the same position as the appellant. We decline to indulge in any speculation that the interviews would, or would not, have been fruitful to the defense.

450 F.2d at 5.

Defendant contends that this case is controlled by *Mendez-Rodriguez, supra*, and the just-published decision of the United States Court of Appeals for the Sixth Circuit in *United States v. Armijo-Martinez*, 669 F.2d 1131 (6th Cir. 1982).

In *Armijo-Martinez, supra*, Defendants were arrested by agents of the Immigration and Naturalization Service [INS] near Pullman, Michigan on August 6, 1980. The agents had procured a search warrant for vehicles, which were driven by Defendants, on the basis of information that the drivers were engaged in transporting illegal aliens to and from work on farms in the vicinity of Pullman. On the morning of the arrest, INS agents saw a number of men getting into two vans, which were then driven away from the loading point by Defendants. When the vans were stopped by the agents, one was found to contain thirteen men and the other was found to contain five male passengers. All appeared to be Hispanic. Concluding that all the passengers were illegal immigrants, the INS agents placed the two Defendants and the eighteen occupants of the vans under arrest.

Later in the day of their arrest, the eighteen occupants of the vehicles were interviewed. All admitted that they were in the United States illegally. The eighteen illegal aliens were searched and all their possessions were collected and inventoried by the agents. There were no documents found on the person, or among the possessions, of any of the eighteen individuals which indicated that they were legally in the United States.

On the day which followed the arrests, a criminal investigator for the INS filed a Complaint against each of the Defendants. Both Complaints listed four of the illegal aliens (two from each van) as material witnesses. During an "initial appearance" before a Magistrate on August 7, 1980, the appointment was made of a defense counsel. At the same time, the Government requested the Magistrate to set a cash bond for each of the four illegal aliens who had been identified as material witnesses in the Complaints. In accompanying affidavits, the INS investigator stated that unless safeguards were imposed to avoid flight of each of the material witnesses, "(i)t would be impracticable to secure his presence by subpoena as he would be in a country outside the United States." Bond for each of the witnesses was set at $1,000.00, and the four aliens were then committed to the Kent County Jail as material witnesses.

The following day, August 8, 1980, letters were sent to two attorneys, who were notified that they had been appointed to represent the Defendants.

On the same date, the remaining fourteen illegal aliens were sent to Detroit by the Government, where they accepted an offer of voluntary departure in lieu of deportation. The fourteen allegedly non-material witnesses were then taken to El Paso, Texas, reaching there on August 10, 1980 at Government expense. By August 12, 1980, all fourteen persons were in Mexico.

Norman Kravitz, who had been appointed to represent one of the Defendants, received his notification of appointment on August 11, 1980. Michael Seften, who was appointed to represent the other Defendant,

received notice of his appointment on August 12, 1980.

One of the four material witnesses posted a $1,000.00 bond and was released on August 20, 1980. The other three witnesses remained in jail for forty-three days until their bond was reduced to $50.00. At least one of the four witnesses was missing at the time of the hearing in District Court.

On August 13, 1980, a Federal Grand Jury indicted one Defendant on thirteen counts of transporting an illegal alien within the United States in violation of 8 U.S.C. § 1324(a)(2), and the other Defendant on five counts, charging the same offense. Each count referred to one of the eighteen illegal aliens and charged a violation which consisted of transporting the named alien within the United States.

Defendants were arraigned on August 25, 1980. On September 26, 1980, both Defendants filed Motions which sought to require the Government to produce the fourteen illegal aliens or dismiss the Indictment. A hearing on these Motions, which consisted of statements by opposing counsel, was held by the District Court. The Government conceded that none of the fourteen illegal aliens had been available for testimony since their return to Mexico on August 12, 1980.

Counsel for one of the two Defendants said that (1) his client did not believe that any of the thirteen occupants of his van were illegally in the United States and (2) his client's eleven passengers, who had returned to Mexico, could corroborate his claim. He also argued that several of the unavailable witnesses had shown his client some identifying information, such as Social Security cards and Immigration (Green) cards which would support the claim that Defendant did not know if any of his passengers were illegal aliens. Since all of the aliens were staying together in a single room at Defendant's residence, he felt that some of the missing witnesses may, or should have, seen others showing him such identification. However, counsel for Defendant contends that he was unable to substantiate his client's claims because of the absence of any opportunity to interview the aliens who had returned to Mexico.

Counsel for the other Defendant stated that one of his client's passengers, who had been permitted to return to Mexico, (1) had been the spokesman for the group and (2) was the individual who had contacted the Defendant about finding work for them. This Defendant claims that the testimony of this witness was required to establish his claim that the five men had been working in a Chicago plant for a long time and had come to Michigan when the plant had closed. Defendant also denied that the admissions within his statement constituted a confession.

In response, the Assistant United States Attorney argued that the statements of the Defendants, which the Government considered to be confessions, were directly contrary to the claimed need for the witnesses, and expressed her concern about the due process rights of persons who are detained for long periods as witnesses without being charged with an offense. At the conclusion of her statement, the Government acknowledged that it would be unable to produce any of the fourteen for a trial.

The District Court, in concluding that the Sixth Amendment right of Defendant to compulsory process had been denied by the unilateral act of the Government, granted Defendants' Motions and dismissed the Indictments. The Government appealed the ruling to the United States Court of Appeals for the Sixth Circuit which, in reliance upon *Mendez-Rodriguez, supra; Tsutagawa, supra; United States v. Valenzuela-Bernal,* 647 F.2d 72 (9th Cir.), *cert. granted,* —— U.S. ——, 102 S.Ct. 501, 71 L.Ed.2d 377 (1981); *United States v. Calzada,* 579 F.2d 1358 (7th Cir.), *cert. dismissed,* 439 U.S. 920, 99 S.Ct. 294, 58 L.Ed.2d 266 (1978); *United States v. Avila-Dominguez,* 610 F.2d 1266 (5th Cir. 1980); *United States v. Arrendondo-Morales,* 624 F.2d 681 (5th Cir. 1980) and *United States v. Henao,* 652 F.2d 591 (5th Cir. 1981), affirmed the determination of the District Court. The Sixth Circuit looked to *United States v. Valenzuela-Bernal, supra,* for the "essential ele-

ments" of this line of cases. These essential elements, as set forth by the Ninth Circuit, and as adopted by the Sixth Circuit, are "(1) unilateral Government action denying a defendant access to a witness; and (2) prejudice; i.e., loss of a conceivable benefit to the defendant from the missing witness' testimony." (Footnote omitted). 647 F.2d at 75.

The Sixth Circuit concluded that, in *Armijo-Martinez, supra*, it was "clear" that there was a violation, in that the first element of *Mendez-Rodriguez, supra*, had been established. The Sixth Circuit determined that the first element was satisfied because:

> (t)he Government had total control over the fourteen eye witnesses. After obtaining the information desired from them, the INS offered them voluntary departure and paid the expenses of their return to Mexico. The witnesses were in Mexico, or in the process of entering that country, when counsel for the Defendants were notified of their appointments. There was absolutely no opportunity for Defendants or their counsel to learn from the witnesses what testimony they might be able to give at trial.

Looking to the second element of *Mendez-Rodriguez, supra*, the Sixth Circuit noted that "(t)hough some showing of prejudice is required, we agree that a 'very low threshold' properly defines the burden of a defendant in these cases. The inescapable fact is that no one knows what a witness may have observed or heard until he or she has been interviewed." The Sixth Circuit determined that Defendants in *Armijo-Martinez, supra*, made a "sufficient showing of prejudice," when they "articulated the issues and identified the type of evidence which they intended to develop—the existence of some facts which would negate a finding that they had knowledge that their passengers were illegal aliens, to wit, been in the United States less than three years."

This Court is of the opinion that its determination of this case is controlled by *Armijo-Martinez, supra*. Although the facts of the instant case are distinguishable from those in *Armijo-Martinez, supra*, the legal principle (to wit, that an accused has a fundamental right under the Fifth and Sixth Amendments to offer the testimony of witnesses, and to compel their attendance, if necessary) is equally applicable to, and governs the determination of, both cases.

In the instant case, as in *Armijo-Martinez, supra*, there is present "unilateral government action denying a defendant access to a witness." Here, the Government argues that "the informant's unavailability for trial is not the result of unilateral government action by the governments to place the witness beyond the reach of the defendant, Charles Taylor," and "(t)hat because the witness' unavailability is not due to unilateral government action, there can be no deprivation of a Sixth Amendment privilege." Although conceding that the informant was (1) provided with a one-way plane ticket to Florida, as well as $1,000.00 in cash, on October 10, 1981, and (2) furnished one-way plane tickets to California for his wife and child, the Government argues that it did not unilaterally place him beyond the subpoena power of the Court. In response, Defendant notes that the informant approached the Government in October, 1981, in fear of his life, seeking plane tickets and money so that he could relocate. Defendant argues that when the Government acted on the informant's request to leave the jurisdiction, it had control over his movement, which was exercised by providing the informant with plane tickets and means to leave. Defendant also contends that the Government "directly facilitated (informant's) flight from this jurisdiction and his unavailability to the defendant who requires him as a crucial witness at trial" with the knowledge, direct or indirect, that he wished to raise an entrapment defense.

The Court is of the opinion that the Government, in the instant case, just like the Government in *Armijo-Martinez, supra*, relinquished its nearly "total control" over a vital witness and offered him "voluntary departure" and "paid the expenses" of his family's departure. Although the Government acted out of an presumptively admira-

ble motive in the instant case, the actions of the Government and its impact on Defendant in *Armijo-Martinez, supra,* are identical with the actions of the Government and its impact on Defendant in the instant case.

Here, Defendant has proved "prejudice," in that he has demonstrated that the Government's unilateral actions have resulted in the "loss of a conceivable benefit to (him) from the missing witness's testimony." Defendant has set forth a plausible argument that he was entrapped by Government agents, and that, in the absence of such entrapment, he would not have acquired possession of the subject firearm.

The United States Court of Appeals for the Sixth Circuit, in *Armijo-Martinez, supra,* noted that "(t)hough some showing of prejudice is required, we agree that a 'very low threshold' properly defines the burden of the Defendant in these cases. The inescapable fact is that no one knows what a witness may have observed or heard until he or she has been interviewed." In *Armijo-Martinez, supra,* the Sixth Circuit determined that the Defendants had made a sufficient showing of prejudice, when they "articulated the issues and identified the type of evidence which they intended to develop—the existence of some facts which would negate a finding that they had knowledge that their passengers were illegal aliens who had been in the United States less than three years." Similarly, in the instant case, Defendant has made a "sufficient showing of prejudice." By his briefs and affidavits, filed with this Court, Defendant has "articulated the issue," and has "identified the type of evidence which (he) intended to develop (to wit, entrapment by Government agents in the instant case).

This Court will not second guess Defendant concerning his position on entrapment, beyond determining that the defense is a plausible one under the facts as presented.

■ Having determined that Defendant's right to compulsory due process was violated by the Government in the instant case, this Court must fashion an appropriate remedy. In *Armijo-Martinez, supra,* the Sixth Circuit concluded that the District Court "tailored relief appropriate to the continuing prejudicial effect of the violation," when it dismissed the Indictment. The Sixth Circuit based its determination on the appropriateness of the remedy in *Armijo-Martinez, supra,* on its determination that a "less drastic remedy than dismissal" would not "preserve (the) defendant's right to a fair trial." The Sixth Circuit noted that "when the constitutional violation is such that the criminal proceedings cannot go forward without continuing the violation, dismissal is the appropriate remedy." This Court is of the opinion that, unless the informant can be produced for trial, this case cannot go forward without "continuing the violation" of Defendant's right to compulsory due process. At the same time, the Court recognizes society's interest in the administration of criminal justice, and the necessity of applying a remedy which is no more drastic than that required to preserve Defendant's right to a fair trial. The Court will allow the Government a period of ten (10) days from the date of this Order to produce Salisbury for trial. In the event that Salisbury is not made available for trial within a period of ten (10) days from the date of this Order, this Court believes that it must, in the interests of justice, dismiss the Indictment in the instant case.

So Ordered.